I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL, POSTAGE PREPAID, TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION ON THIS DATE.

DATED: 3-4-03

_Chelissa Cash_

DEPUTY CLERK

SCAN ONLY

FILED
CLERK, U.S. DISTRICT COURT

MAR - 4 2003

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| LYLE MENENDEZ, | Case No. CV 00-02359 R (AN) |
| Petitioner, | |
| v. | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| C. A. TERHUNE, | |
| Respondent. | |

This Report and Recommendation is submitted to the Honorable Manuel L. Real, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01-13 of the United States District Court for the Central District of California. For the reasons set forth below, United States Magistrate Judge Arthur Nakazato recommends that the Court deny the Petition for Writ of Habeas Corpus and dismiss this action with prejudice.

## I. BACKGROUND

### A. Underlying Offense

On March 20, 1996, Petitioner Joseph Lyle Menendez was convicted in Los Angeles County Superior Court for the murder of his parents, Jose and Mary Louise ("Kitty") Menendez. [Clerk's Transcript ("C.T.") vol. 48 at 13220-22, 13231-32.] According to the

ENTER ON ICMS

MAR - 5 2003

evidence presented at trial, on the evening of August 20, 1989, Jose and Kitty were at home watching television in the den of their house in Beverly Hills. [Reporter's Transcript ("R.T.") vol. 257 at 43084, vol. 261 at 43619, 43627-28.] At approximately 10:00 p.m., their two sons, Lyle, age 21, and Erik, age 18, burst into the den armed with shotguns and began firing. [R.T. vol. 257 at 43071-72, vol. 261 at 43627-32.] Jose and Kitty Menendez both died of multiple gunshot wounds. [R.T. vol. 238 at 39864.]

## B. State Court Proceedings

Based on the foregoing, Lyle and Erik were charged in Los Angeles County Superior Court with two counts of murder while lying in wait and one count of conspiracy to commit murder. [C.T. vol. 2 at 548-50.] The state sought the death penalty against both defendants. [R.T. vol. 1 at 77.] The trial court ordered that the defendants be tried together in a single proceeding with two separate juries. [C.T. vol. 16 at 4263, 4306; R.T. vol. 23 at 2603, vol. 25 at 2725-26.] Trial commenced on June 14, 1993, in the Van Nuys division of the Superior Court. [C.T. vol. 18 at 4755; R.T. vol. 27 at 2980.]

At trial, the facts of the homicides were largely undisputed by the defense. [R.T. vol. 50 at 7068, 7118.] Both defendants testified and conceded they intentionally shot their parents to death on the night of August 20, 1989. [R.T. vol. 84 at 14152, vol. 88 at 14627-30, vol. 94 at 15630, vol. 95 at 15882-89.] The position of the defense was that Lyle and Erik lived in fear of their parents due to a lifelong pattern of abuse. [R.T. vol. 50 at 7070-73, 7080-92, 7124-49.] Lyle testified that both of his parents were physically and psychologically abusive toward him throughout his life. [R.T. vol. 84 at 14156-59, 14168, 14187-88, vol. 85 at 14262-63, 14329-31, 14337, 14372-79.] He also testified that his father sexually molested him for approximately two years from the ages 6 to 8. [R.T. vol. 84 at 14199-203.] Erik gave similar testimony regarding abusive conduct by his parents. [R.T. vol. 94 at 15646, 15656-58, 15720-23, 15753, vol. 95 at 15911-33, 15987-94, vol. 96 at 16091-95, 16113-14, 16156.] However, his testimony regarding sexual abuse at the hands of his father was much more extensive. According to Erik's testimony, his father regularly

1  and severely molested him from the time he was six-years-old until the time of the murders
2  when he was 18. [R.T. vol. 94 at 15633-39, 15655-56, 15672, 15776, vol. 95 at 15933-87,
3  16005-06, 16009-17, vol. 96 at 16059-68.]

4       The defendants also testified that events in the days leading up to the shooting caused
5  them to fear for their lives. On August 15, 1989 — a Tuesday — Erik told Lyle that he was
6  being sexually abused by their father. [R.T. vol. 88 at 14544-46, vol. 94 at 15700.] On
7  Thursday, August 17, Lyle confronted his father about the sexual abuse of Erik, threatening
8  to report it if Jose did not stop. [R.T. vol. 88 at 14566-71.] As a result of this confrontation,
9  Erik and Lyle felt that their lives were in danger. [R.T. vol. 88 at 14571-72, 14575-80, vol.
10  94 at 15721-22, 15741-42, 15745, 15748, 15759.] Both defendants testified that their
11  parents had threatened to kill them at various points in their lives, and both thought that their
12  parents were capable of carrying out such threats. [R.T. vol. 85 at 14378, vol. 88 at 14469-
13  70, 14586, vol. 94 at 15735, vol. 95 at 15997, 16013-14, vol. 96 at 16164-65.] Erik, in
14  particular, testified that, on one occasion when he refused to engage in sex with his father,
15  Jose Menendez threatened Erik's life by holding a knife to his throat. [R.T. vol. 94 at 15658,
16  15777-78, vol. 95 at 16013-14.] Furthermore, both brothers testified that Jose threatened to
17  kill them if they ever revealed the sexual abuse of Erik. [R.T. vol. 84 at 14203-04, vol. 94
18  at 15704, 15721-22, 15773, vol. 96 at 16055.] Accordingly, Lyle and Erik believed that,
19  after Lyle's confrontation with his father on August 17, Jose and Kitty formulated a plan to
20  kill their sons before they could report the sexual abuse. [R.T. vol. 88 at 14583, 14594-96,
21  14604, 14612-13, 14618-20, vol. 94 at 15795-98, 15801-02, 15805-06, vol. 95 at 15839-40.]
22  Lyle and Erik also knew that their parents owned firearms. [R.T. vol. 87 at 14434, vol. 95
23  at 15827-28.] Thus, the brothers felt that they needed some way to defend themselves and
24  so, on Friday the 18th, they went out and bought two shotguns. [R.T. vol. 88 at 14580-93,
25  vol. 94 at 15758.]

26       Matters came to a head on Sunday, August 20. Lyle and Erik thought that their
27  parents were making arrangements to kill them that day. [R.T. vol. 88 at 14620-22.] In the
28  evening, there was a family argument in which Lyle again confronted his father about the

1  sexual abuse of Erik. [R.T. vol. 88 at 14623-24, vol. 95 at 15858-63.] At the end of the

2  argument, Jose and Kitty ordered Lyle and Erik to stay in the house instead of going out and

3  then retired to the den to watch television. [R.T. vol. 88 at 14622-25, vol. 95 at 15864-69.]

4  At that point, the defendants testified, they believed that they were in danger of being killed

5  by their parents. [R.T. vol. 88 at 14625, vol. 95 at 15863, 15870-71, 15881, 16017.] In a

6  burst of panic and fear, they both retrieved the shotguns they had purchased, returned to the

7  den, and shot their parents to death. [R.T. vol 88 at 14626-30, vol. 95 at 15876-93.]

8      Based on this testimony, the defense asserted that Lyle and Erik killed their parents

9  out of fear for their lives. [R.T. vol. 50 at 7068, 7146-47.] The defense conceded that the

10  brothers were not entitled to an outright acquittal based on self-defense because, given the

11  facts, they could not have reasonably believed that their lives were in immediate danger.

12  [R.T. vol. 140 at 24519-20.] However, the defense did argue that their fear of being killed,

13  while unreasonable, was held in good faith. [R.T. vol. 140 at 24520.] Accordingly, the

14  defense asked the jury to convict the defendants of an offense no greater than involuntary

15  manslaughter. [R.T. vol. 140 at 24520, 24728, vol. 144 at 25401.]

16      The jury in Lyle's case began its deliberations on the afternoon of December 10, 1993.

17  [C.T. vol. 23 at 5941; R.T. vol. 141 at 24863.] The jury for Erik began deliberating on the

18  afternoon of December 15, 1993. [C.T. vol. 23 at 5959; R.T. vol. 144 at 25537.] On January

19  13, 1994, Erik's jury reported that it was hopelessly deadlocked, and the trial judge declared

20  a mistrial in the case against Erik. [C.T. vol. 24 at 6125; R.T. vol. 150 at 26012-13.] On

21  January 28, 1994, the jury in Lyle's case also reported being deadlocked, and the judge

22  declared a mistrial with respect to Lyle as well. [C.T. vol. 25 at 6311; R.T. vol. 154 at

23  26178-80.]

24      Thereafter, the court began preparing for a retrial of both defendants. The court again

25  ordered that the defendants be tried together in a single proceeding, however the court held

26  that in the second trial there would be a single jury for both defendants. [C.T. vol. 34 at

27  8996; R.T. vol. 173 at 27941-52.] The retrial began on August 23, 1995, again in the Van

28  Nuys courthouse. [C.T. vol. 44 at 11953; R.T. vol. 197 at 31444.]

During the second trial, the defense again took the position that Lyle and Erik killed their parents out of fear for their own lives. [R.T. vol. 220 at 36093-95, vol. 221 at 36217.] Lyle did not testify on his own behalf during the retrial. However, Erik did take the stand and again testified that his parents subjected him to severe physical and psychological abuse and that his father, in particular, regularly molested him from the time he was six-years-old. [R.T. vol. 257 at 43072, 43083-92, vol. 258 at 43104-23, 43127-35, 43159, 43172-83, vol. 259 at 43223, 43246, 43278-82, 43287-309, 43315-24, 43374-76, vol. 260 at 43407, 43498.] He also testified that, in the days leading up to the shooting, he and his brother came to believe that their parents were plotting to kill them in order to keep the brothers from revealing the sexual abuse of Erik. [R.T. vol. 257 at 43073-74, vol. 260 at 43464-68, 43498, 43502, 43564, vol. 261 at 43620-23.] Thus, the defense asserted that, at the time of the killings, the brothers harbored a sincere, albeit unreasonable, belief that their lives were in danger from their parents and, hence, the defendants were guilty of no more than manslaughter. [R.T. vol. 220 at 36092, 36101, vol. 221 at 36217-18, vol. 303 at 51661, vol. 304 at 51903-06, 51911-13, vol. 305 at 52018, 52040-46, vol. 306 at 52195-96, 52213.]

The case was given to the jury on March 1, 1996. [C.T. vol. 47 at 13094; R.T. vol. 307 at 52410.] On March 20, 1996, the jury returned its verdicts, finding both defendants guilty of two counts of first degree murder and one count of conspiracy to commit murder, violations of California Penal Code §§ 187(a) & 182(a)(1). [C.T. vol. 48 at 13217-22, 13231-32; R.T. vol. 313 at 52494-507.] Pursuant to California Penal Code § 190.2(a)(3) & (15), the jury also found true the special circumstance allegations that the defendants committed multiple murders and committed the murders while lying in wait. [C.T. vol. 48 at 13217-22; R.T. vol. 313 at 52494-507.]

The penalty phase of the trial began on March 27, 1996, and on April 12 the jury began its deliberations regarding punishment. [C.T. vol. 48 at 13250, 13278; R.T. vol. 315 at 52544, vol. 327 at 54986.] On April 17, 1996, the jury returned its verdicts, fixing the penalty for both defendants at life imprisonment without parole. [C.T. vol. 48 at 13315-19; R.T. vol. 328 at 54989-91.] On July 2, 1996, pursuant to the jury's verdicts, the trial court

1    sentenced each defendant to two consecutive terms of life without the possibility of parole.
2    [C.T. vol. 48 at 13401-07; R.T. vol. 329 at 55018-20.]

3         Following sentencing, the defendants jointly appealed to the California Court of
4    Appeal.  [C.T. vol. 48 at 13407(a)-13407(c).]  On February 27, 1998, the state appellate
5    court issued its opinion affirming the judgments of conviction. [Motion to Dismiss, Ex. C.]
6    Subsequently, Lyle Menendez filed a Petition for Review with the California Supreme Court.
7    [Motion to Dismiss, Ex. E.]  On May 27, 1998, the state high court denied review.  [Motion
8    to Dismiss, Ex. F.]  Lyle then filed, on October 5, 1998, a habeas petition with the California
9    Supreme Court.  [Motion to Dismiss, Ex. G.]  The application for habeas relief was denied
10   on March 31, 1999.  [Motion to Dismiss, Ex. H.]

11

12   **C. Present Action**

13        Lyle Menendez, the Petitioner in this action, now comes to this Court seeking to
14   challenge his conviction by means of a Petition for Writ of Habeas Corpus pursuant to 28
15   U.S.C. § 2254.[1]  In his Petition, Petitioner raises the following grounds for relief:

16        1.    The trial court erroneously permitted the state to introduce into evidence
17              statements Petitioner made to a mental health expert.

18        2.    The trial court excluded critical testimony supporting the defense theory of the
19              case.

20        3.    The trial court excluded critical expert testimony directly supporting
21              Petitioner's theory of the case.

22        4.    The trial court ruled that critical expert and lay testimony would not be
23              admitted unless Petitioner himself elected to testify.

24        5.    Petitioner received ineffective assistance of counsel to the extent the trial
25              court's ruling regarding Petitioner's decision to testify was not preserved
26              properly for appeal.

27   _____

28   [1] Petitioner's co-defendant, Erik Menendez, also is seeking habeas relief from this Court in a pending
     action.  *See Menendez v. Mueller*, CV 99-08552 R (AN).

                                              6

6.    The timing of the trial court's decision not to instruct the jury in accord with the theory of defense ambushed defense counsel and deprived Petitioner of the effective assistance of counsel.

7.    The trial court's refusal to instruct on the theory of defense violated the Constitution.

8.    The prosecutor committed misconduct by moving to exclude a great deal of lay and expert testimony and then, during closing argument, skewering the defense for failing to present this very testimony.  The trial court erred by overruling defense counsel's objections to this conduct and denying the defense's motion to reopen argument to expose the falsity of the prosecutor's argument.

9.    The prosecutor improperly exercised peremptory challenges on the basis of gender.

[Petition at 3-37.]

In response to the Petition, Respondent filed a Motion to Dismiss on August 23, 2000, arguing that various claims should be dismissed on procedural grounds.  Specifically, Respondent contended that four claims — Grounds Two, Six, Eight, and Nine — had not been exhausted in the California state courts. [Motion to Dismiss at 6-10.] Respondent also asserted that one of Petitioner's claims — Ground Four — was barred under the doctrine of procedural default. [Motion to Dismiss at 10-18.] Finally, Respondent argued that five of the claims — Grounds One, Two, Three, Seven, and Eight — do not state a federal claim for relief. [Motion to Dismiss at 19-28.]

The Court found that all of Petitioner's claims are exhausted except for certain factual allegations in Ground Two. [Memorandum & Order filed 11/27/00 at 4-11.] Petitioner was given an opportunity to dismiss the unexhausted factual allegations from Ground Two and was cautioned that, if he failed to do so, there would be a recommendation that the entire Petition be dismissed as a "mixed" petition. [*Id.* at 11-12, 14-15.] The Court further found that Ground Four is not procedurally defaulted and that all of the claims, at least on their face, appear to state federal claims and should not be summarily dismissed. [*Id.* at 12-14.]

7

In response to the Court's findings, Petitioner notified the Court that he wished to withdraw the unexhausted factual allegations from Ground Two and to proceed with this action on the remaining, exhausted claims.  [Court Ordered Response filed 2/5/01.]

On April 23, 2001, Respondent filed a Return to the Petition, arguing that Petitioner's remaining claims fail on their merits.  Petitioner filed his Traverse on June 21, 2001.  The matter now stands submitted.

## II. ANALYSIS

### A. Standard of Review

The federal habeas statute prescribes the degree of deference that must be accorded in federal habeas proceedings to state court decisions which previously addressed pending habeas claims, providing as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  By its own terms, this standard of review is triggered by a previous "adjudicat[ion] on the merits in State court proceedings."  In this case, all of Petitioner's remaining, exhausted claims were presented to the California Court of Appeal on direct review, and the state appellate court addressed each claim during the course of its 112-page, reasoned opinion rejecting the appeal.  [*See* Motion to Dismiss, Ex. C.]  Therefore, the

1  statute's deferential standard of review applies and governs this Court's analysis of the

2  merits of Petitioner's claims.

3      A state court decision is "contrary to" clearly established federal law if the state court

4  applies a rule that contradicts the governing law set forth by the Supreme Court or if the state

5  court confronts a set of facts that are materially indistinguishable from those in a decision

6  of the Supreme Court and nevertheless arrives at a different result. *Williams v. Taylor*, 529

7  U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision involves

8  an "unreasonable application of" clearly established federal law if the state court identifies

9  the correct governing legal principle from the decisions of the Supreme Court but applies

10 that principle to the facts of the case in a way that is objectively unreasonable. *Id.* at 407-11.

11      However, to find an unreasonable application of Supreme Court precedent, a federal

12 habeas court may not conclude merely that the petitioner has the better of two reasonable

13 legal arguments. *Van Tran v. Lindsey*, 212 F.3d 1143, 1153-54 (9th Cir.), *cert. denied*, 531

14 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000). Rather, the reviewing court must find that

15 "clear error" occurred. *Id.* That is, the court must be left with a firm conviction that one

16 answer, the one rejected by the state court, was correct and the other, the application of

17 federal law that the state court adopted, was erroneous. *Id.*

18

19  **B. Ground One: Admission of Statements to Psychologist**

20      In Ground One of the Petition, Petitioner contests the admission into evidence of

21 statements he made to a mental health expert. [Petition at 3-7.] On December 11, 1989,

22 Petitioner and Erik met with their psychologist, Dr. Jerome Oziel. During the session, the

23 general circumstances surrounding the killings were discussed, and both brothers made

24 damning admissions. Oziel recorded an audiotape of the session, which was seized by police

25 during the investigation and which was played for the jury during the prosecution's case-in-

26 chief. [R.T. vol. 222 at 36438-59.] Petitioner now quarrels with the introduction of the tape

27 into evidence, arguing that it violated the attorney-client privilege because Oziel was hired

28 by and was assisting Petitioner's lawyer in the course of his representation. [Petition at 3.]

1    According to Petitioner, his statements to Oziel were confidential communications

2    encompassed within the attorney-client relationship and should not have been admitted into

3    evidence. [Petition at 3-7; Memorandum in Support of Petition at 27-36; Traverse at 1-9.]

4        The California Court of Appeal ruled that the trial court did not err in its handling of

5    the audiotape as evidence. First, the appellate court found that the tape was not rendered

6    inaccessible by the attorney-client privilege because the December 11 session was not a

7    confidential communication between a client and a lawyer, as defined under California's

8    Evidence Code. [Motion to Dismiss, Ex. C at 93-95.] The court further held that Petitioner

9    waived the psychotherapist-patient privilege by tendering his mental and emotional condition

10   as an issue at trial. [*Id.* at 95-96.] Therefore, the state court determined that the audiotape

11   of the session with Oziel was admitted properly at trial. That decision was not contrary to,

12   or an unreasonable application of, clearly established federal law.

13       A federal court may entertain an application for a writ of habeas corpus by a state

14   prisoner "only on the ground that he is in custody in violation of the Constitution or laws or

15   treaties of the United States." 28 U.S.C. § 2254(a). Violations of state law are not

16   cognizable in a federal habeas corpus petition. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112

17   S.Ct. 475, 116 L.Ed.2d 385 (1991). A federal court sitting in habeas can review an

18   application of state law for an alleged constitutional violation. *Hernandez v. Ylst*, 930 F.2d

19   714, 719 (9th Cir. 1991). However, only the denial or misapplication of state procedures that

20   results in the deprivation of a constitutional right will warrant federal habeas relief. *Bonin*

21   *v. Calderon*, 77 F.3d 1155, 1162 (9th Cir.), *cert. denied*, 516 U.S. 1143, 116 S.Ct. 980, 133

22   L.Ed.2d 899 (1996).

23       Thus, a petitioner may not challenge an evidentiary ruling on the grounds that it

24   violated the state's evidence code. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir.

25   1991). The failure to comply with a state's rules of evidence is neither a necessary nor

26   sufficient basis for granting federal habeas relief. *Id*. Indeed, the presence or absence of a

27   state law violation is irrelevant. *Id*. Rather, an evidentiary ruling may be challenged only

28   if it rendered the trial so fundamentally unfair as to violate due process. *Windham v. Merkle*,

1  163 F.3d 1092, 1103 (9th Cir. 1998).  The admission of evidence violates due process only

2  when there are no permissible inferences the jury may draw from that evidence.  *Id.*

3  However, when the evidence gives rise to an inference which is relevant to some fact of

4  consequence, its admission cannot be deemed a constitutional violation. *Id.* at 1104.  The

5  petitioner bears the burden of overcoming the presumption that the evidentiary ruling was

6  correct and not violative of due process. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir.

7  1996).  In fact, a trial court's determination that certain evidence has probative value is given

8  great deference, particularly on habeas where such conclusions are accorded a presumption

9  of correctness. *Id.* at 898.

10        In this case, Petitioner's challenge to the admission of the audiotape is premised on

11  his claim that it infringed on his relationship with his lawyer.   [*See* Petition at 3;

12  Memorandum in Support of Petition at 27-36.]  However, the attorney-client privilege is

13  merely a rule of evidence, not a constitutional right. *Partington v. Gedan*, 961 F.2d 852, 863

14  (9th Cir.), *cert. denied*, 506 U.S. 999, 113 S.Ct. 600, 121 L.Ed.2d 537 (1992).  Therefore, a

15  claim that the attorney-client privilege has been violated is a matter of state law and

16  generally raises no federal constitutional issues. *Beckler v. Superior Court*, 568 F.2d 661,

17  662 (9th Cir. 1978).  In some situations, governmental interference with the confidential

18  relationship between a defendant and his counsel *may* implicate Sixth Amendment rights if

19  the defendant is substantially prejudiced. *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir.

20  1985), *cert. denied*, 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986).  A finding of

21  such a violation, though, necessarily assumes that there was in fact a confidential relationship

22  between a lawyer and his client. *Williams v. Woodford*, 306 F.3d 665, 682-83 (9th Cir. 2002).

23  Furthermore, the scope of the privilege is a function of state law, not federal constitutional

24  law.  *Partington*, 961 F.2d at 863.  That is, the attorney-client privilege is created and

25  controlled by state law, and the nature and extent of the attorney-client privilege is defined

26  by state law. *Evans v. Raines*, 800 F.2d 884, 888 n.4 (9th Cir. 1986).

27        Here, the California Court of Appeal ruled that the audiotape did not spring from any

28  attorney-client relationship because the December 11, 1989, session with Dr. Oziel was not

a confidential communication between a client and a lawyer. [Motion to Dismiss, Ex. C at 93-95.]  Instead, the session was for the purpose of therapy.  [*Id.*]  This decision was affirmed by the California Supreme Court. [Motion to Dismiss, Ex. F.]  A federal habeas court is bound by the state court's interpretations of state law. *Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir.), *cert. denied*, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).  The California courts have ruled that the recording did not impact any attorney-client relationship.  That ruling, as a determination of state law, must be respected by this Court and removes from consideration any claim that the admission of the tape somehow infringed upon Petitioner's rights with respect to his counsel.

In any event, the only proper consideration for this Court on habeas review is whether the admission of the audiotape gave rise to no permissible inferences, thereby rendering the trial so fundamentally unfair as to violate due process. *Windham*, 163 F.3d at 1103.  A review of the evidence from the audiotape, in the context of the trial as a whole, reveals that the tape, in fact, spawned highly relevant inferences.  As discussed above, the primary subject of the litigation in this case was the state of mind of the defendants at the time of the shooting.  The prosecution asserted that the defendants intentionally took the lives of Jose and Kitty Menendez in a manner that was willful, deliberate, and premeditated.  The defense countered that the two brothers felt compelled to use self-defense, relying on Erik's testimony that he and Petitioner killed their parents in a sudden surge of terror that they were about to be killed themselves.  However, that testimony was undermined severely by the audiotape.  In fact, the defendants' statements to Dr. Oziel indicate that the shooting was considered carefully beforehand and was not the product of mortal fear.  For example, in explaining why the homicides occurred, the brothers revealed the following:

> [Oziel]: Well, when, when you ended up um, killing your mom, did you feel like you were, did you feel like you were sparing her? I know she was horribly depressed, and um, she was totally dominated by your dad. She was like a shell of a person. She had no identity or strength left anymore. You had been, I know that

you had been responding to her as, as, I think almost like a person that becomes sort of pitiful. Now, that's a strong word, but is that how you felt?

[Erik]: Well, we, we were, we were doing almost, in my mom's case, something that, that first of all, there was, there was no way, never could she live without my father.

[Oziel]: Uh, huh.

[Erik]: It was . . . .

[Lyle]: That was something that we had to really, it was a big thing holding us back. Ah, from killing my father was that we thought that we would just kill dad, and eliminate the problem.

. . . . .

[Lyle]: That's where we sort of feel like, you mentioned before, that we were doing her and us a favor. In putting her out of her misery, really . . . .

. . . . .

[Lyle]: And ah, so ah, for my mother's sake. I, I thought that ah, we did it, it was we had to come, like I was saying before, we had to make a decision. It was one of the harder ones, and it was a separate issue. . . . (unint.) He's the reason. My father should be killed. There's no question. What he's doing is, he's impossible to live with for myself, and for . . . .

[Oziel]: (unint.)

[Lyle]: . . . . myself, based on what he's doing to my mother.

. . . .

[Lyle]: But I still don't think it had anything to do with, killing him had nothing to do with us. It had to do with me realizing a number of things that all culminated, which was, and could have

1    culminated at any point.  And it was just a question of Erik and I

2    getting together, and somebody bringing it up, and us realizing the

3    value in it.

4    [Transcript of Oziel Audiotape at 4-5, 9, 12-13, 15.]

5        Later in the session, Petitioner further explained his rationale for carrying out the

6    shooting, relating the following:

7        [Lyle]: And ah, and I still think mom's was a suicide.  Because I,

8        you know, I feel that in her letters to, to Erik and I, she gave me

9        the permission. . . . Ah, to sort of, she had given me permission to,

10        to, to please carry out her suicide, and that it was obvious that she

11        had decided in her own mind, she wants to die. . . . That what Erik

12        and I did took courage beyond belief.  Beyond, beyond strength.

13        There was no way I was gonna make a decision to kill my mother

14        without Erik's consent.  I was going, I didn't even wanna

15        influence him in that issue.  I just let him sleep on it for a couple

16        of days.  Cause ah, I did . . . I, I, I'm in a very ah, good position to

17        influence Erik in a lot of things.  Because he knows that I care,

18        and a whole number of issues.  That I can talk eloquently or

19        whatever.  And ah, but when it came to that issue, I wanted

20        nothing to do with it.  It had to be his own personal issue.  If he

21        felt the same way I did about killing mom.  And ah, you know, I,

22        I feel angry toward my relatives.  "Why didn't you do something,

23        when you knew what was going on, and I didn't?"  And when I

24        found out, you know, I did something about it.  I did what I

25        thought my mother would want me to do.  Which is, "Please kill

26        me, and I can't."

27        . . . .

28        [Lyle]: And ah, getting back to ah, what, what Erik was ah feeling

14

and I wanted to say that we, you know, it would be great if, if we were able to work on it, cause even, you know our relationship, because even the planning out of this, the reason it took such a short period of time to figure it out was one, because it could have happened at any moment.

[Oziel]: Uh, huh.

[Lyle]: All the thinking . . . .

[Oziel]: Uh, huh.

[Lyle]: . . . . beforehand was done really.

[Oziel]: Yeah. You already know what you felt.

[Lyle]: Ah, we knew what we felt, and we knew everything about that. Ah, honestly I never thought it would happen. Even though I had thought about it. Ah, but it was ah, it was done so quickly, and so, sort of callously almost, because one, we, if you thought about it too much, the feelings of not having your parents around, and so on, would get in the way of what was more important. Which was helping your mother really.

[Transcript of Oziel Audiotape at 30-33.]

As the foregoing indicates, Petitioner's description of the incident on the tape conveyed a clear impression that the shooting was much more of a deliberate and purposeful deed, rather than the instinctive act of self-preservation that was portrayed by the defense. Petitioner conceded that they killed their father to "eliminate the problem" because he was "impossible to live with," and that they planned it upon "realizing the value in it." [Transcript of Oziel Audiotape at 4-5, 12-13, 15.] He also explained that they killed their mother because "we were doing her and us a favor. In putting her out of her misery." [*Id.* at 9.] In fact, Petitioner believed that their mother had given them "permission" to kill her and that her murder was, in effect, a "suicide." [*Id.* at 30.] Petitioner further admitted that the killings had been planned out sometime beforehand and that after he made the conscious

decision to kill their mother he let Erik "sleep on it for a couple of days." [*Id.* at 31-33.] When they ultimately carried out their plan, they did it "quickly" and "callously" so that "the feelings of not having your parents around" would not "get in the way." [*Id.* at 33.] Therefore, far from leading to no permissible inferences, the audiotape was highly relevant to a fact of considerable consequence — namely, the defendants' states of mind. The evidence of the audiotape supported a conclusion that the shooting was more calculated than spontaneous and did not occur in a frenzied moment of fear and panic. As such, there could be no due process violation in the trial court's decision to allow the prosecution to introduce the tape into evidence.

Moreover, even assuming the audiotape was erroneously allowed, its impact on the proceedings did not give rise to reversible error. A claim of improperly admitted evidence is subject to harmless error analysis. *Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir. 1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). Under the harmless error standard, a trial defect does not entitle a petitioner to federal habeas relief unless the flaw "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). That is, reversal of a conviction is not warranted unless the trial error resulted in "actual prejudice." *Id.* There is no actual prejudice from improperly admitted evidence where other evidence of the petitioner's guilt is overwhelming. *Bonin*, 59 F.3d at 843. In this case, any prejudicial effect caused by the admission of the audiotape was harmless because the evidence on the tape was merely cumulative to, and strongly corroborated by, a wealth of other evidence against Petitioner that was powerfully incriminating.

At trial, Petitioner's co-defendant, Erik, admitted on the stand that he and Petitioner intentionally shot their parents with shotguns, and Petitioner's defense counsel did not dispute this. [R.T. vol. 221 at 36217-18, vol. 261 at 43624-38.] Thus, the actus reus of the crime was established. The only matters that were at issue were whether the defendants harbored the requisite mental state to support a finding of first-degree murder or whether they acted in self-defense. Under California law, murder is the unlawful killing of a human

being with "malice aforethought." CAL. PENAL CODE § 187(a).  Such malice may be either express or implied. CAL. PENAL CODE § 188.  It is express when the defendant manifests a deliberate intention unlawfully to take away a person's life. *People v. Blakeley*, 23 Cal.4th 82, 87, 96 Cal.Rptr.2d 451 (Cal. 2000).  Malice is implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, and the act was deliberately performed by a person who knows that his conduct endangers the life of another yet who acts with conscious disregard for that life. *Id.*  A murder is of the first degree if it is willful, deliberate, and premeditated. CAL. PENAL CODE § 189.  "Premeditated" means that it was considered beforehand, and "deliberate" means that it was performed as a result of careful thought and weighing of considerations for and against the proposed course of action. *People v. Mayfield*, 14 Cal.4th 668, 767, 60 Cal.Rptr.2d 1 (Cal.), *cert. denied*, 522 U.S. 839, 118 S.Ct. 116, 139 L.Ed.2d 68 (1997).  However, a person who intentionally kills in the sincere, albeit unreasonable, belief that he must resort to self-defense lacks malice and is guilty only of voluntary manslaughter, not murder. *Blakeley*, 23 Cal.4th at 88.

There was substantial evidence, besides the audiotape, that the two brothers carefully planned the homicides beforehand and that the shooting was not a spontaneous act of self-defense.  Two days before the crime, on August 18, 1989, they drove to San Diego to purchase two shotguns, paying with cash and using false identification.  [R.T. vol. 229 at 38243-69, vol. 231 at 38713-19, vol. 260 at 43509-30.]  At the time they bought the shotguns, they also purchased ammunition, which turned out to be birdshot.  [R.T. vol. 260 at 43530-31.]  When they later learned that birdshot is not effective ammunition against humans, they purchased buckshot shells.  [R.T. vol. 260 at 43559-60.]  On Saturday, August 19, they attempted to take one of the shotguns to a firing range so that they could practice with it.  [R.T. vol. 260 at 43557-59.]

The evidence regarding the shooting itself also strongly supported a finding that the defendants acted with a deliberate intention to kill their parents rather than in self-defense.  After the family argument on the evening of Sunday, August 20, Jose and Kitty retired to the den to watch television.  [R.T. vol. 261 at 43618-19.]  After conferring, Petitioner and Erik

went to retrieve their respective shotguns and then met up again at Erik's car to load the shotguns with the buckshot shells. [R.T. vol. 261 at 43620-24.] After loading the firearms, they went back into the house. [R.T. vol. 261 at 43625.] At the time that they burst into the den with the loaded shotguns, their parents were unarmed, watching television, eating blueberries with whipped cream, and drinking lemonade. [R.T. vol. 221 at 36267-68, vol. 261 at 43625-30, vol. 269 at 45072-79.] Nevertheless, the brothers began firing at them, discharging several rounds until their shotguns were empty. [R.T. vol. 261 at 43629-34.] Upon hearing their mother moaning in pain, they ran out of the house, went back to Erik's car, and reloaded Petitioner's shotgun. [R.T. vol. 261 at 43634-36, vol. 268 at 44958-63, vol. 269 at 45005-06.] When they went back inside the house, Petitioner returned to the den and fired one more shot, killing his mother. [R.T. vol. 261 at 43636-38, vol. 268 at 44963-72.]

In addition, the forensic evidence did not support a finding that the victims were themselves attackers who were disabled by someone who was defending himself. Between them, the defendants fired a total of twelve shots, Erik firing five of them and Petitioner being responsible for the rest. [R.T. vol. 241 at 40420-93, vol. 243 at 40595-645, vol. 268 at 44952.] Jose suffered four separate wounds and Kitty suffered nine. [R.T. vol. 238 at 39866.] Each of them had a contact wound to the head, caused when the muzzle of a shotgun was held against the victim's head and discharged. [R.T. vol. 238 at 39867-72, 39885-89.] They each also had at least one leg wound on or near the kneecap. [R.T. vol. 238 at 39867, 39882-84, 39908-17.] In the case of Jose, the leg wound was postmortem, inflicted after he had already been shot in the head. [R.T. vol. 238 at 39882-84, 39916-17.] The nature of these wounds was such that they appear to have been intended to lead authorities to believe that the murders were connected to organized crime, and the police in fact pursued such a theory for a time during the investigation. [R.T. vol. 223 at 36747-48, vol. 225 at 37082-85.]

The defendants' conduct after the shooting was most consistent with that of individuals who had committed a deliberate, unlawful killing for which they wished to

escape responsibility, rather than a necessary act of self-defense. For example, immediately after the slayings, they gathered up all the shotgun shells, fearing that fingerprints on the shells might be detectable. [R.T. vol. 221 at 36277, vol. 261 at 43642-43, 43648-49.] They then drove to a movie theater to buy tickets for the purpose of establishing an alibi. [R.T. vol. 261 at 43652-56.] Following that, they set about finding a place to dispose of the murder weapons, ultimately depositing them in a secluded, wooded area near Mulholland Drive. [R.T. vol. 261 at 43656-60.] Later, they stopped at a gas station to discard other incriminating evidence, throwing the shotgun shells and blood-spattered clothes into a garbage dumpster. [R.T. vol. 261 at 43661-63.]

Eventually, they returned home and made preparations to call the authorities. [R.T. vol. 261 at 43666-67.] They agreed to tell the police that they were at the movies at the time of the murders and discussed the details to ensure their respective stories corresponded. [R.T. vol. 261 at 43667-68.] Petitioner then placed a call to the police, and they went outside to wait. [R.T. vol. 261 at 43673-74.] When a patrol car arrived, Petitioner and Erik ran up to the officers screaming and acting hysterically. [R.T. vol. 223 at 36780-84.] When Petitioner was questioned that night, he led the interviewing detective to believe that he had nothing to do with the killings. [R.T. vol. 224 at 37057-59, vol. 225 at 37082-85.] In fact, in the weeks following the crime, Petitioner repeatedly espoused the theory that the killing of his parents was "business-related" or was arranged by the "Mafia." [R.T. vol. 224 at 36897-904, vol. 230 at 38419-20, vol. 234 at 39100-01, 39264-65.] These statements, along with the nature of the gunshot wounds, also led detectives to pursue the organized-crime theory for a time during the investigation. [R.T. vol. 225 at 37082-85.] In order to perpetuate the theory that the murders were related to organized crime, Petitioner went so far as to hire bodyguards for a time, making it known that he believed his life was in danger from the same individuals who killed his parents. [R.T. vol. 230 at 38417-20.]

The testimony of one witness who observed the Menendez family members interacting with one another the day before the shooting significantly undermined the assertion of the defense that the two brothers were living in mortal fear of their parents. On Saturday,

August 19, 1989, Grant Walker, a swimming pool maintenance man, went to the family's home to repair a broken override switch on the pool equipment. [R.T. vol. 228 at 37775-80.] While he was working, the Menendez family was on the nearby tennis court. [*Id.* at 37776-78.] Petitioner was playing tennis with some other individual while Erik, Jose, and Kitty were watching from courtside. [*Id.* at 37784.] During the thirty to forty minutes that he was working on the pool, Walker overheard the conversation among the family members. [*Id.* at 37783-84.] Throughout the conversation, both Petitioner and Erik directed angry words at their parents, including obscenities. [*Id.* at 37784-94.] It appeared to Walker that the brothers were belligerent and disrespectful toward their parents. [*Id.* at 37855.] Despite this treatment, neither Jose nor Kitty ever became angry at their sons. [*Id.* at 37801-02.]

There was substantial circumstantial evidence that the defendants killed their parents for monetary gain. At the time of their deaths, Jose and Kitty Menendez were fairly wealthy. Their assets included the family home in Beverly Hills, valued at between $3.5 million and $4 million with a net value of $1.5 million, and a second home in Calabasas, valued at $1.35 million. [R.T. vol. 226 at 37375-78.] Jose also owned stock in L.I.V.E. Entertainment, the company for which he served as chairman of the board, worth $5 million. [R.T. vol. 226 at 37381-82; R.T. vol. 237 at 39776.] Jose and Kitty originally prepared a will in 1981, naming their sons as the only beneficiaries. [R.T. vol. 226 at 37372-73.] However, in June or July of 1989, Jose decided to take both Petitioner and Erik out of the will because he was unhappy with their conduct. [*Id.* at 37353-54.] In particular, Jose was frustrated with their spendthrift habits, their lack of academic achievement, and certain incidents in which they had gotten into trouble. [*Id.* at 37354-59, 37420-21.] Jose made it known to the brothers that he was preparing to take them out of the will. [*Id.* at 37359-60, 37416.] It is unknown whether Jose actually prepared a new will before his death. [*Id.* at 37360.]

Very shortly after the homicides, Petitioner and Erik began trying to determine if there was, in fact, a new will. On August 21, 1989, the day after the shooting, the two brothers went to the home of a family friend who was an attorney to seek his assistance in locating and probating their parents' will. [R.T. vol. 225 at 37146-62, vol. 226 at 37269-83.] They

20

seemed particularly concerned about accessing their father's computer to find out if it contained a new or amended version of the will. [R.T. vol. 225 at 37153-60, vol. 226 at 37285-86.]  When the attorney suggested that perhaps the will was kept in the family safe, the brothers returned home, retrieved the safe, and immediately brought it back to the attorney's house. [R.T. vol. 225 at 37157-64, vol. 226 at 37286-91.]  They also went to a bank with family members to check the contents of a safe-deposit box in their father's name. [R.T. vol. 226 at 37369-70, vol. 236 at 39696.]  In each instance when either the safe or the safe-deposit box was opened, the brothers asked anyone else who was present to leave the room so that the brothers could open the repository in privacy. [R.T. vol. 226 at 37370-71, vol. 236 at 39692-700.]  No revised will was ever found. [R.T. vol. 226 at 37295-96, 37367-68, 37371, vol. 236 at 39694.]  In the absence of any new will, the terms of the 1981 will controlled, and Petitioner and Erik were to inherit Jose and Kitty's entire estate. [R.T. vol. 226 at 37373.]  In addition, the brothers each collected over $325,000 in life insurance proceeds after their parents' deaths. [R.T. vol. 236 at 39683.]

In the weeks and months following the homicides, both Petitioner and Erik spent substantial sums of money.  On August 24, 1989, four days after the shooting, the two brothers went shopping together at a jewelry store in Century City, purchasing three Rolex watches and two money clips totaling over $15,000. [R.T. vol. 228 at 37882.]  Within a few months, they both rented units at an upscale condominium complex in Marina Del Rey. [R.T. vol. 229 at 38086, vol. 230 at 38328-31.]  Sometime in September or October, they hired a tennis coach, retaining his services for one year at $6,000 per month. [R.T. vol. 229 at 38072-73.]  On his own, Petitioner purchased two separate homes and a restaurant in Princeton, New Jersey; another Rolex watch; a Saab-900 Turbo as a Christmas present for his girlfriend; a Porsche 911 Carrera Cabriolet for himself; and many thousands of dollars worth of clothes. [R.T. vol. 224 at 36906, vol. 226 at 37392-96, vol. 230 at 38426-27, vol. 234 at 39105-11, 39119-21, 39220-22, 39233-40, 39263-64, 39269-70.]  He also expended significant sums to cover the start-up costs of a commercial real estate investment company he created. [R.T. vol. 234 at 39116-19.]  For his part, Erik purchased a customized Jeep

Wrangler for approximately $21,000, paying in cash; gambled away somewhere between $5,000 and $8,000 during a trip to Lake Tahoe and Reno; traveled to Israel to participate in a tennis tournament; and made an offer of $1.1 million on a house in Marina Del Rey. [R.T. vol. 229 at 38077-79, vol. 231 at 38592-603, 38644-52, 38700-09.]

Based on all the foregoing, it is clear that the prosecution had an exceedingly strong case against Petitioner for the charge of first-degree murder. Petitioner's pre-crime preparations in terms of securing the murder weapons and the ammunition, the manner in which he killed his defenseless parents when they posed no threat of immediate harm, and his post-crime attempts to conceal his culpability all strongly support a finding of premeditated, first-degree murder rather than self-defense. In light of that evidence, the admission of the audiotape, even if erroneous, could have had no substantial or injurious effect or influence in determining the jury's verdict. *See Ortiz-Sandoval*, 81 F.3d at 897-98 (evidence of a threat, even if improperly admitted, was harmless in light of undisputed evidence that petitioner deliberately walked to his vehicle, loaded a shotgun, walked back into the house, and killed the victim). Accordingly, Petitioner's Ground One for relief must be denied.

## C. Ground Two: Exclusion of Testimony Regarding History of Abuse

Ground Two deplores the trial judge's preclusion of several witnesses sought by Petitioner's defense counsel to support his claims of abuse. Petitioner points out that, at trial, the defense attempted to call some 31 different witnesses — including former teachers, former coaches, friends, and family members — to testify regarding a long history of abuse perpetrated by Jose and Kitty on their sons. [Petition at 8.] However, much of this testimony was disallowed by the trial court. [Petition at 10.] Petitioner now argues that the exclusion of such testimony eviscerated his case and violated his right to present witnesses in his own behalf under the Sixth and Fourteenth Amendments of the United States Constitution. [Petition at 8-17; Memorandum in Support of Petition at 37-46; Traverse at 9-19.]

## 1. Exhaustion

As discussed above, the Magistrate Judge previously ruled that certain factual bases in support of Ground Two have not been exhausted properly in the state courts. [Memorandum & Order filed 11/27/00.] Petitioner objected to this ruling and sought review by the District Judge. [Motion for Review and Reconsideration of Magistrate Judge's Order.] This review was denied. [Memorandum & Order filed 1/17/01.] As the Court previously explained to Petitioner, in a proceeding referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B), immediate interlocutory review by the District Judge of an interim ruling made by the Magistrate Judge is not available. *Magee v. Rowland*, 764 F.Supp. 1375, 1376 (C.D. Cal. 1991). Instead, interim rulings of the Magistrate Judge are not subject to review by the District Judge until a final Report & Recommendation is issued. *Id.* at 1376-77. Therefore, review of the Magistrate Judge's ruling regarding Petitioner's failure to exhaust state remedies has not been appropriate until now. Petitioner, in fact, seeks such review with respect to the Magistrate Judge's finding that certain factual bases in support of Ground Two have not been exhausted in the state courts. [Court Ordered Response filed 2/5/01.]

As a matter of comity between state and federal courts, a federal court should not address the merits of a habeas corpus petition unless the petitioner first has sought state judicial review of every ground presented in the petition. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Indeed, Congress has instructed that a habeas petition brought by a person in state custody cannot be *granted* "unless it appears that — (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). An unexhausted petition may be *denied* on the merits. 28 U.S.C. § 2254(b)(2). However, in the usual case, the most appropriate course of action for a district court presented with an unexhausted petition is to dismiss the petition without prejudice. *Tamalini v. Stewart*, 249 F.3d 895, 899 (9th Cir. 2001).

To exhaust state remedies, a petitioner must fairly present his claims to the state courts, either on direct appeal or through collateral proceedings, giving the state the opportunity to pass upon and correct the alleged violations of the petitioner's federal rights. *Reese v. Baldwin*, 282 F.3d 1184, 1190 (9th Cir. 2002), *petition for cert. filed*, 71 U.S.L.W. 3443 (U.S. Dec. 2, 2002) (No. 02-964). In the state proceeding, the petitioner must describe both the operative facts and the federal legal theory underlying each claim. *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003). Furthermore, the petitioner must characterize the claims he raises in the state court specifically as federal claims. *Reese*, 282 F.3d at 1190. To do so, the petitioner must either reference specific provisions of the federal Constitution or statutes or cite to federal case law. *Id.* at 1191. The specific allegation cannot be an implied one; there must be explicit reference to federal law. *Id.* Neither may a petitioner transfer a federal-law citation from one claim to other claims in the petition. *Id.* at 1193. To fairly present a federal habeas claim to a state court, it is essential that the petitioner provide a reference to federal authority to support that particular claim. *Id.*

In addition, it is not adequate for a petitioner to present his contentions to just any state court — exhaustion requires that the allegations be presented to the state's court of last resort. *O'Sullivan v. Boerckel*, 526 U.S. 838, 843-47, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Moreover, exhaustion must be established with respect to each and every claim, since a habeas petition which includes both exhausted and unexhausted claims (i.e., a "mixed petition") must be dismissed without prejudice in its entirety. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The petitioner has the burden of demonstrating that he has exhausted available state remedies. *Williams v. Craven*, 460 F.2d 1253, 1254 (9th Cir. 1972).

Among his factual allegations in support of Ground Two, Petitioner complains that the trial court excluded the testimony of one of his cousins, Marianne Cano; the testimony of two of his teachers, Patricia Cross and Sandra Sharp; and evidence of an essay Petitioner wrote at the age of 14 about sexual molestation. [Petition at 11-15; Memorandum in Support of Petition at 39-42.] These specific factual claims were never presented to the California

Supreme Court.  [Motion to Dismiss, Exs. E & G.]  Petitioner concedes as much.
[Opposition to Motion to Dismiss at 9.]  However, he argues that such omissions are not fatal
because he did raise in the state courts the general claim that the trial judge excluded
evidence of long-term abuse.  [*Id.* at 7-11.]  Petitioner believes that he is not required to
plead his claims based on the exact same facts as were presented in the state proceedings.
[*Id.* at 4-7.]  Petitioner's argument does not reflect the law.

To satisfy the exhaustion doctrine, a federal habeas petitioner must provide the state
courts with a fair opportunity to apply controlling legal principles to the facts bearing upon
his constitutional claims. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3
(1982).  "It follows that the federal habeas court must not hear factual allegations that were
not before the state courts." *Hudson v. Rushen*, 686 F.2d 826, 830 (9th Cir. 1982), *cert.
denied*, 461 U.S. 916, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983).  "A claim may be considered
unexhausted if it includes new factual allegations which were not presented to the state
courts." *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994).  Thus, where a petitioner
presents the federal court with a claim supported by new factual allegations not previously
presented to the state courts, such a claim must be dismissed without prejudice as
unexhausted. *Aiken v. Spalding*, 841 F.2d 881, 883-84 (9th Cir. 1988).

In this case, by Petitioner's own admission, some of the factual predicates supporting
his claim for relief in Ground Two were never presented to the California state courts.
Petitioner never raised in the state proceedings the factual allegations that the trial judge
improperly excluded from evidence the testimonies of Marianne Cano, Patricia Cross, and
Sandra Sharp and the essay Petitioner wrote regarding sexual molestation.  Therefore,
Ground Two, as articulated in the Petition, was partially unexhausted and subject to
dismissal unless it was amended.

Accordingly, it is recommended that the Court affirm the Magistrate Judge's Order
finding that Petitioner's Ground Two was partially unexhausted.  [*See* Memorandum &
Order filed 11/27/00 at 4-8.]  It is further recommended that the Court affirm the Magistrate
Judge's Order directing Petitioner either to voluntarily dismiss the unexhausted factual

allegations or face dismissal of the entire action. [*See* Memorandum & Order filed 11/27/00 at 11-12, 14-15.] Having filed a mixed Petition, Petitioner properly was given the choice of either deleting his unexhausted factual allegations and proceeding with his exhausted grounds or dismissing his entire Petition. *See Rose*, 455 U.S. at 510, 520; *James v. Pliler*, 269 F.3d 1124, 1125-26 (9th Cir. 2001). Petitioner opted to delete the unexhausted allegations and proceed with the balance of his grounds for relief. [*See* Court Ordered Response filed 2/5/01.] Therefore, the factual allegations in Ground Two regarding Marianne Cano, Patricia Cross, Sandra Sharp, and the essay should be deemed properly dismissed from this action, and the Court should proceed to the merits of Petitioner's remaining claims.

## 2. Merits of the Claim

The California Court of Appeal considered Petitioner's claim regarding the exclusion of evidence of abuse and found it to have no merit. The court recognized that a defendant has a constitutional right to present a defense and call witnesses in his favor. [Motion to Dismiss, Ex. C at 77.] However, the court also recognized that this right is subject to limitation by established rules of procedure and evidence which are designed to assure both fairness and reliability. [*Id.*] Thus, a trial judge has discretion to exclude or limit either side's evidence during trial to prevent excessive consumption of time or undue prejudice and to avoid confusing the issues or misleading the jury. [*Id.* at 78.] In this case, the court noted, while certain witnesses were excluded, the defense was allowed to present several witnesses who testified about incidents of physical and mental abuse committed by Jose and Kitty on their sons. [*Id.*] The proposed testimony which was excluded would have just served to corroborate other testimony already presented to the jury regarding the relationship the defendants had with their parents. [*Id.*] Indeed, the appellate court found, the very length of the defense's case — over two full months — belied the argument that the trial court arbitrarily limited the number of witnesses offered by the defense. [*Id.* at 77.] Thus, the court ruled that the limitations on testimony did not hinder Petitioner's presentation of his

1   defense to the jury. [*Id.* at 78.] The decision of the state court did not contravene clearly

2   established federal law.

3          Whether rooted in the Due Process Clause of the Fourteenth Amendment or in the

4   Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution

5   guarantees criminal defendants a meaningful opportunity to be heard and to present a

6   complete defense by introducing relevant evidence on their own behalf. *Crane v. Kentucky*,

7   476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). However, a defendant's right

8   to present relevant evidence is not unlimited but, rather, is subject to reasonable restrictions

9   to accommodate other legitimate interests in the criminal trial process. *United States v.*

10  *Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Thus, state and

11  federal rulemakers have broad discretion to establish rules excluding evidence from criminal

12  trials. *Id.* For example, trial judges have wide latitude to disallow evidence that is repetitive;

13  only marginally relevant; or poses an undue risk of harassment, prejudice, or confusion of

14  the issues. *Crane*, 476 U.S. at 689-90.

15         In particular, a trial court retains considerable latitude, even with relevant evidence,

16  in rejecting that which is cumulative. *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct.

17  2887, 41 L.Ed.2d 590 (1974). "Cumulative" evidence is that which replicates other admitted

18  evidence. *United States v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979), *cert. denied*, 445 U.S.

19  919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980). Thus, where a defendant seeks to corroborate

20  his version of events with evidence which merely duplicates substantial evidence already

21  before the jury, the court may disallow such testimony without running afoul of the

22  Constitution. *United States v. Hernandez*, 876 F.2d 774, 778-79 (9th Cir.), *cert. denied*, 493

23  U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989). Cumulative evidence will almost never

24  outweigh the state's interest in efficient judicial process. *Perry v. Rushen*, 713 F.2d 1447,

25  1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

26  Therefore, the exclusion of such evidence is within the sound exercise of the trial judge's

27  discretion. *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir. 1984). In this case,

28  while the trial court did bar some testimony which tended to support the defendants' claim

1  that they were abused by their parents, such testimony was wholly cumulative to, and largely

2  outweighed by, an enormous quantity of admitted evidence which more than adequately

3  depicted the defense's version of events.

4      First, and most significantly, Erik testified at great length about the mistreatment he

5  and his brother were subjected to throughout their lives.  Indeed, Erik was on the stand

6  during direct examination for roughly seven full court days, and he testified for another

7  seven days on cross-examination.  All told, his testimony fills over two thousand pages of

8  trial transcripts.  During that time, Erik catalogued a considerable array of incidents of abuse

9  he and Petitioner suffered dating from the time they were small children.  For example, Erik

10 described various forms of bizarre and sadistic psychological abuse, including being locked

11 in closets by his mother and being nearly drowned by his father during swimming lessons.

12 [R.T. vol. 258 at 43120-23, vol. 259 at 43236-39, 43257-77, 43320-24.]  He testified to

13 physical abuse, relating how he and Petitioner were frequently struck by their parents as a

14 form of punishment.  [R.T. vol. 257 at 43089-92, vol. 258 at 43140-41, 43159-64, 43177-78,

15 43181, 43183, vol. 259 at 43241-46, 43268-71, 43304-05, 43315, 43323, vol. 260 at 43433,

16 43484, 43498, 43515-16.]  He also recounted with vivid explicitness the molestation by his

17 father, describing Jose's various sexual preferences.  [R.T. vol. 257 at 43083-88, vol. 258

18 at 43110-20, 43127-35, 43172-83, vol. 259 at 43223, 43278-82, 43287-310, 43373-78, vol.

19 262 at 43725, vol. 273 at 45703.]  He reported that his parents had threatened the lives of the

20 two brothers, and he gave his own assessment of the credibility of such threats.  [R.T. vol.

21 259 at 43250-51, 43314-15, 43323-24, 43373-76, vol. 260 at 43498, 43501-02, vol. 273 at

22 45764-65.]  Furthermore, Erik testified about his state of mind on the night of the shooting

23 and explained the basis for the brothers' fear that they were in danger from their parents.

24 [R.T. vol. 260 at 43450-72, 43511-12, vol. 261 at 43620-24, vol. 263 at 43898, vol. 273 at

25 45769-78.]

26      The defense also was permitted to elicit testimony from various witnesses who had

27 spent time around the Menendez family while the brothers were growing up and who tended

28 to corroborate the defense's allegations of abuse.  For example, Brian Andersen, a cousin of

Petitioner, testified that Jose disciplined his sons by beating them with a belt, producing bruises on their arms, thighs, and buttocks and leaving them so sore they had difficulty walking. [R.T. vol. 276 at 46354-59, 46399-400.]  According to Andersen, this was a frequent event, occurring multiple times a week. [R.T. vol. 276 at 46359-60.]  Another cousin, Diane Vandermolen, confirmed that Jose subjected his sons to very rigorous swimming lessons, often holding their heads under water for prolonged periods of time. [R.T. vol. 277 at 46599-605.]  She also described incidents when Kitty would fly into a rage and become physically and verbally abusive toward the brothers. [R.T. vol. 277 at 46607-16.]  Diane's sister, Kathleen Simonton, gave similar testimony regarding harsh swimming-training techniques. [R.T. vol. 278 at 46960-62.]  Andy Cano, also a cousin, testified that when Erik was 12 or 13 years old he confided to Cano that Jose was molesting him. [R.T. vol. 284 at 48146-55.]  In addition, Cano testified that Erik constantly had bruises on his body and that a jar of Vaseline was kept in Erik's room. [R.T. vol. 284 at 48159-60.]  A number of witnesses further testified that Jose would often be alone with one of his sons in the boy's bedroom with the door closed and that, during those times, everyone else in the house was under strict orders not to go near the bedroom. [R.T. vol. 276 at 46366-67, 46389-90, vol. 277 at 46616-22, vol. 278 at 46963-66.]

As the foregoing makes clear, a survey of the record in this case reveals that Petitioner did in fact introduce an enormous quantity of evidence supporting his allegations of abuse. This evidence took the form of Erik's testimony, which chronicled many years of maltreatment the brothers suffered at the hands of their parents, and the testimony of third-party witnesses, who directly observed Petitioner's upbringing.  He has not argued that there was any further testimony which was qualitatively different or more persuasive than that which the defense presented at trial.  It appears that Petitioner simply would have liked to have increased the raw volume of corroborating testimony at the expense of judicial efficiency.  Therefore, Ground Two is appropriately denied on the grounds that any further evidence regarding the allegations of abuse would have been cumulative to testimony already presented to the jury.

### D. Grounds Three, Four, & Five: Exclusion of Other Abuse Evidence

Grounds Three, Four, and Five are related claims which further challenge the trial court's exclusion of certain witnesses the defense sought to have testify on Petitioner's behalf in support of his allegation that he had suffered abuse at the hands of his parents. As will be discussed below, Grounds Three and Four fail on their merits and Ground Five, which was pled to avoid a procedural default of Ground Four, has been rendered moot by a previous ruling of the Court.

### 1. Ground Five is Moot

In his Motion to Dismiss, Respondent argued that Petitioner's Ground Four must be dismissed as procedurally defaulted because that claim was rejected by the California Court of Appeal on the grounds that it had been waived at trial when defense counsel failed to raise a proper constitutional objection. [Motion to Dismiss at 10-18.] Apparently anticipating that argument, Petitioner included in his Petition Ground Five, which contends that to the extent Ground Four was waived by counsel's failure to properly object, then Petitioner received ineffective assistance of counsel. [Petition at 24-25; Memorandum in Support of Petition at 62-64.] A procedural default may be discharged by a federal court when the petitioner can establish some excusable cause for the default, such as ineffective assistance of counsel during the state proceedings. *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

However, as discussed above, Respondent's procedural default argument regarding Ground Four has been considered and rejected. As the Court found, it appears that Petitioner's Ground Four was in fact addressed on the merits by the California Supreme Court and, in any event, there was excusable cause for any default. [Memorandum & Order filed 11/27/00 at 12-13.] Petitioner's Ground Four has not been procedurally defaulted and, thus, there was no ineffective assistance on the part of trial counsel. Accordingly, Petitioner's Ground Five for relief, which was pled to avoid any procedural default of Ground Four, has been rendered moot.

## 2. Merits of Grounds Three and Four

The substantive claims in Grounds Three and Four directly challenge rulings of the trial court excluding testimony supporting Petitioner's allegations of abuse.  In Ground Three, Petitioner bemoans the court's decision disallowing proffered testimony from two psychologists, Dr. Stuart Hart and Dr. John Conte.  According to Petitioner, Hart would have testified that Petitioner suffered from Battered Person Syndrome as a result of severe psychological maltreatment at the hands of his parents.  [Petition at 19-20.]  Conte also would have testified that Petitioner suffered from Battered Person Syndrome and that this condition affected Petitioner's perceptions and conduct on the night of the murder.  [Petition at 20-22.]  Petitioner believes that the exclusion of such testimony violated his due process right to present a defense.  [Petition at 17-22; Memorandum in Support of Petition at 47-53; Traverse at 19-25.]

In Ground Four, Petitioner claims that "[t]he trial court ruled that critical expert and lay testimony would not be admitted unless petitioner himself elected to testify."  [Petition at 22.]  According to Petitioner, the trial judge disallowed the testimony of certain witnesses, including Dr. Conte, "unless petitioner first waived his Fifth Amendment privilege and testified."  [Petition at 23.]  Petitioner asserts that such a ruling violates his rights under the Fifth and Sixth Amendments as well as the Supreme Court's decision in *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).  [Petition at 22-24; Memorandum in Support of Petition at 54-62; Traverse at 26-28.]

During trial, the judge explained that the reason testimony regarding Petitioner's mental state, including the expert testimony of psychologists, was not allowed was because the defense had not established a foundation for its admission.  [R.T. vol. 306 at 52291.]  The trial judge explained the basis for his decision-making as follows:

> The relevance of the expert testimony of these experts that
> we've referred to in the hearing, the relevance of that testimony
> was to and is to corroborate the testimony of the defendants
> regarding their mental state at the time of the killing, and to dispel

certain misconceptions regarding the conduct of an individual faced with a situation or circumstances as described by the defendants.

The issue, as I looked at it and look at it now, is the state of mind of the defendants at the time of the killing as to whether there was an actual belief of imminent danger of death or great bodily injury and a need to act. Obviously, if that actual belief is not presented to the jury, then the experts have nothing to corroborate. . . . .

Since the relevance of the expert testimony is related to the state of mind of the defendants at the time of the killing, the purpose of the experts' testimony that they had — that the defendants fit a certain diagnosis; that they are, whatever the expert says, a battered person — they fit the — or fit the diagnosis of a post-traumatic stress disorder, that is only to corroborate the defendants' testimony as to their mental state at the time of the crime.

. . . . .

It's really irrelevant, and it would be totally irrelevant to any trial, that the defendants had been abused or that they fit a particular diagnosis of being abused. That's totally irrelevant, unless it corroborates their testimony as to their mental state at the time of the crime. If it doesn't do that, then the fact that they happen to be abused or happen to fit a particular diagnosis is irrelevant.

. . . . .

And as I look at it, the foundation of the testimony — of the evidence is the defendants' own testimony of that belief [of

32

imminent danger].

[R.T. vol. 218 at 35838-39, 35841, 35843.]  Based on that rationale, the trial judge made a series of evidentiary rulings regarding witnesses, both lay and expert, that the defense wished to examine to support its theory that years of abuse caused the defendants to fear for their lives on the night of the homicides.  Some of the witnesses were allowed and some were tentatively excluded on various grounds, including lack of relevance and lack of foundation, subject to reconsideration if other testimony rendered those witnesses admissible.  [R.T. vol. 218 at 35854-906, vol. 275 at 46222-81, vol. 276 at 46287-331, vol. 277 at 46538-79, 46738-74, vol. 284 at 48281-312, vol. 285 at 48315-34.]  As the court again emphasized at one point, its concern was not that the defendants testify first but that the testimony of other witnesses not be admitted without a proper foundation having been laid:

> And my concern is that the defendant, Lyle Menendez, is doing exactly what it is that I indicated was problematical before we started, introducing or attempting to introduce testimony from so-called source witnesses prior to introducing, in some fashion, the basis for or the connection or rationale for that testimony being received, which would basically be his testimony.

[R.T. vol. 275 at 46230.]

The California Court of Appeal agreed with these rulings of the trial court.  The appellate court found that the issue before the trial court was not whether the defendants were required to testify before their lay and expert witnesses testified but, rather, whether the testimony of those witnesses was admissible despite a lack of foundation.  [Motion to Dismiss, Ex. C at 73.]  As the court held, the defendants, in pursuing their defense of imperfect self-defense, had to show that they subjectively perceived an imminent danger before corroborating testimony by lay witnesses or mental-state testimony by expert witnesses became relevant.  [*Id.* at 73-74.]  That is, as a foundational matter for asserting the doctrine of imperfect self-defense under California law, the evidence had to show that Petitioner actually perceived an imminent danger before testimony could be admitted with

33

respect to how a history of abuse might have affected his perception of danger. [*Id.* at 89-90.] However, as the appellate court noted, Petitioner and his counsel made a tactical decision that he should not testify. [*Id.* at 89.] Without his testimony that he was afraid of his parents on the night of the shooting, the court ruled, testimony regarding his mental state was inadmissible on the grounds that it lacked foundation. [*Id.* at 89-90.] The decisions of the state courts were consonant with federal law.

It is true that the erroneous exclusion of critical, corroborative defense evidence may violate both the right to a fair trial and the right to present a defense if the evidence excluded is the sole or primary piece of evidence attesting the defendant's version of events. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062-63 (9th Cir. 2001). However, the testimony disallowed in this case was neither erroneously excluded nor the centerpiece of Petitioner's defense. There is no constitutional violation in the exclusion of defense evidence for which a proper foundation has not been laid, even if such foundation would require the defendant himself to testify. *United States v. Singh*, 811 F.2d 758, 762-63 (2nd Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987). This Court lacks authority to assay the propriety of the state courts' holding that there was no foundation for the testimony of witnesses regarding Lyle's mental state. Evidentiary rulings under state law are beyond the scope of federal habeas review. *DePetris*, 239 F.3d at 1061-62. The state courts here have reached a conclusion about the admissibility of the evidence in question based on an application of California's Evidence Code, and this Court must respect that conclusion.

Furthermore, the testimony excluded was not the most critical evidence in support of Petitioner's defense. Rather, his claim of imperfect self-defense necessarily was based primarily on the testimony of Erik and other family members, all of whom testified to a long history of abuse Petitioner suffered at the hands of his parents from the time he was a child. This testimony was presented to the jury at great length and in great detail and was *the* critical evidence corroborating Petitioner's version of events. Thus, there is no merit to Petitioner's contention that the exclusion of witnesses in this case violated his constitutional rights to a fair trial and to present a defense.

In addition, Petitioner's claims also fail to the extent they are grounded in the authority of *Brooks v. Tennessee*. In that case, the Supreme Court invalidated a Tennessee statute which required that a criminal defendant desiring to testify must do so before any other testimony for the defense was heard. The Court found that such a rule was an impermissible restriction on a defendant's right against self-incrimination, and held that a defendant and his counsel may not be restricted in deciding whether and when in the course of presenting his defense the accused should take the stand. 406 U.S. at 609-13. The evidentiary rulings in the present case do not transgress the prohibition erected by the Supreme Court in *Brooks*.

The decision in *Brooks* does not constitute a general prohibition against a trial court's regulation of the order of trial in a way that may affect the timing of a defendant's testimony. *Harris v. Barkley*, 202 F.3d 169, 173 (2nd Cir. 2000). Indeed, the Court in *Brooks* itself cautioned that its holding does not otherwise curtail in any way the ordinary power of a trial court to set the order of proof. 406 U.S. at 613. Elsewhere, the Supreme Court has emphasized that a trial judge, in his role as governor of the trial, must be allowed to determine generally the order in which parties will adduce proof. *Geders v. United States*, 425 U.S. 80, 86-87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). Thus, a trial court does not err by excluding defense evidence until after it has been shown by other testimony to be relevant and admissible. *Singh*, 811 F.2d at 762-63. In fact, as discussed above, a trial judge acts well within his authority when he refuses to accept proffered evidence until a proper foundation has been laid, even if that foundation requires the testimony of the defendant himself. *Id.*

Here, the trial court never expressly directed the defense to put Petitioner on the stand prior to introducing other evidence — the type of ruling that would run afoul of the proscription in *Brooks*. Instead, the court made a series of rulings regarding the admissibility of testimony based on the relevance and foundation which had been established to that point. Such rulings are well within the authority of a trial judge and do not give rise to a constitutional claim. Accordingly, Petitioner's Grounds Three, Four, and Five should be denied.

### E.  Grounds Six & Seven: Imperfect Self-Defense Instruction

Grounds Six and Seven are related claims which revolve around trial court rulings regarding the defense's request for an imperfect self-defense instruction.  In Ground Seven, Petitioner disparages the court's refusal to instruct on imperfect self-defense, arguing that such refusal violated his due process right to have the jury instructed on the defense's theory of the case. [Petition at 31; Memorandum in Support of Petition at 80-83; Traverse at 34-38.]  In the alternative, in Ground Six, Petitioner argues that even if the trial court's ruling denying the imperfect self-defense instruction was not substantively erroneous, the *timing* of the ruling — after the close of evidence — effectively "ambushed defense counsel and deprived petitioner of the effective assistance of counsel." [Petition at 25-26.]  According to Petitioner, during pretrial proceedings, the trial judge led defense counsel to believe that an imperfect self-defense instruction would definitely be given at the end of the trial, causing counsel to rely futilely on that theory of defense.  [Petition at 25-31; Memorandum in Support of Petition at 65-79; Traverse at 28-34.]

At trial, the defense requested that the court read to the jury California's version of the imperfect self-defense instruction.  After hearing argument from both sides, the trial court denied the request, finding that the defense had not presented substantial evidence of imminent peril so as to justify giving the instruction.  [R.T. vol. 298 at 50663-70.]  The California Court of Appeal concurred with that conclusion, also finding insubstantial evidence to support an imperfect self-defense instruction. [Motion to Dismiss, Ex. C at 118-19.]  In addition, the appellate court noted that the factual question posed by the omitted instruction — whether Petitioner killed his parents in the sincere, albeit unreasonable, belief that he had to resort to self-defense — was necessarily resolved adversely to Petitioner when the jury found Petitioner guilty of deliberate, premeditated murder while lying in wait and conspiracy to commit murder.  [*Id.* at 123-25.]  Thus, the Court of Appeal found no error in the trial court's refusal to instruct on imperfect self-defense.  [*Id.* at 118-25.]  Furthermore, the appellate court held that there was no "court-induced" ineffective assistance of counsel. [*Id.* at 126.]  That decision did not violate federal law.

1    In order to secure relief from this Court on a claim of instructional error, a petitioner

2 must demonstrate a violation of the Constitution. *Estelle*, 502 U.S. at 71-72. Failure to give

3 a jury instruction which might be proper as a matter of state law does not, by itself, merit

4 federal habeas relief. *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985), *cert. denied*, 475

5 U.S. 1049, 106 S.Ct. 1271, 89 L.Ed.2d 579 (1986).  Thus, a claim that a court erred in

6 omitting an instruction requires a showing that the error so infected the entire trial that the

7 resulting conviction violated due process. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct.

8 1730, 52 L.Ed.2d 203 (1977).  Furthermore, a petitioner's burden in such a case is especially

9 heavy because an omission of an instruction is less likely to be prejudicial than an

10 affirmative misstatement of the law. *Id.* at 155.

11    Due process does not require that an instruction be given unless it is warranted under

12 the circumstances of the case. *Miller*, 757 F.2d at 993.  Therefore, a defendant is not entitled

13 to an instruction on his theory of the case unless it is supported by law and has some

14 foundation in the evidence. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

15 Moreover, it is not reversible error to reject a defendant's proposed instruction on his theory

16 of the case if the other instructions, in their entirety, adequately cover the defense's theory.

17 *Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995), *cert. denied*, 517 U.S. 1158, 116 S.Ct.

18 1549, 134 L.Ed.2d 651 (1996).  At trial, it is the judge's responsibility to determine whether

19 the testimony given meets a minimum standard as to each element of a defense so as to

20 justify a jury instruction concerning that defense. *United States v. Bailey*, 444 U.S. 394, 414-

21 16, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).  A state trial judge's finding that the evidence

22 does not support a claim of imperfect self-defense is entitled to a presumption of correctness

23 on federal habeas review. *Hartman v. Summers*, 120 F.3d 157, 160-61 (9th Cir. 1997).

24 Petitioner has not overcome that presumption in this case.

25    Under California's doctrine of imperfect self-defense, when the trier of fact finds that

26 a defendant killed another person because the defendant actually but unreasonably believed

27 he was in "imminent danger of death or great bodily injury," the defendant is deemed to have

28 acted without malice and thus can be convicted of no crime greater than voluntary

manslaughter. *In re Christian S.*, 7 Cal.4th 768, 771, 30 Cal.Rptr.2d 33 (Cal. 1994). However, this doctrine is "narrow." *Id.* at 783. It requires that the defendant must have had an actual belief in the need for self-defense. *Id.* Furthermore, fear of future harm will not suffice, no matter how great the fear and no matter how great the likelihood of the harm. *Id.* The defendant's fear must be of *imminent* danger to life or great bodily injury. *Id.* The peril must appear to the defendant as immediate and present, not prospective or even in the near future. *Id.* That is, an imminent peril is one that, from appearances, must be dealt with instantly. *Id.* Without a finding of an actual fear of imminent harm, there is no defense of imperfect self-defense under California law. *Id.* The trier of fact must determine whether the defendant possessed such a fear based on all the relevant facts and is not required to accept the defendant's bare assertion of such a fear. *Id.*

Based on the foregoing principles, California's standard instruction regarding imperfect self-defense directs the jury as follows:

> A person, who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.
>
> As used in this instruction, an "imminent" [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.
>
> [However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force],

[attack] [or] [pursuit].]

California Jury Instructions — Criminal (CALJIC) No. 5.17. However, a California state trial judge must give this instruction only if there is substantial evidence to support it. *Christian S.*, 7 Cal.4th at 783. There was not substantial evidence to support the instruction in this case.

According to Erik's testimony, on the evening of the homicides, there was a family argument in the foyer near the front entrance to the house. [R.T. vol. 261 at 43608-19.] At that point, Erik testified, he and his brother believed that their parents were going to kill them. [*Id.* at 43620-21.] However, other than Erik's bare assertion of this fear, none of the other relevant facts supported a finding that they actually believed they were in imminent peril. After the argument, Jose and Kitty retired to the den to watch television, closing the doors behind them. [*Id.* at 43619.] Nevertheless, the brothers retrieved their shotguns, went outside to Erik's car to obtain the buckshot shells, loaded their weapons, went back into the house, and ran into the den to kill their parents. [*Id.* at 43621-32.] Furthermore, after his mother was incapacitated but not yet dead, Petitioner went back to the car, reloaded his shotgun, returned to the house, and went back into the den to fire the final shot killing Kitty. [*Id.* at 43633-38.]

There is no basis in Erik's testimony, though, to conclude that the brothers were in fear, even unreasonable fear, of any danger so immediate as to necessitate this assault. Petitioner's parents made no threats to kill the brothers that day. [R.T. vol. 268 at 44914-16, 44924.] There is no evidence that his parents were in possession of any weapons that day. [*Id.* at 44916-17, 44924.] When the brothers went to retrieve their shotguns and the ammunition, no one was chasing them. [*Id.* at 44910-13.] No one was verbally or physically threatening them prior to the shooting. [*Id.* at 44924, 44934-35.] As Erik acknowledged, once his parents went into the den and closed the doors, he did not even know what they were doing. [*Id.* at 44913-14.] Jose and Kitty were not in the brothers' presence, they were not threatening them, and there was absolutely nothing preventing the brothers from simply leaving home and driving away from whatever danger they claim they feared. [*Id.* at 44923-

24, 44933-34, 44936-38.] While Erik repeatedly asserted on the stand that he feared for his life, it is clear from his description of the circumstances that his fear was of some future, prospective jeopardy, not an immediate threat that had to be dealt with instantly. Indeed, Erik expressly conceded that any threat posed by his parents was at some point "in the future." [*Id.* at 44943-44.] There simply was no evidence in Erik's testimony that the brothers actually believed they were in "imminent danger of death or great bodily injury," and since he did not testify, there was no direct evidence of Petitioner's state of mind at all.

Furthermore, even without the instruction on imperfect self-defense, the instructions actually given to the jurors allowed them to consider Petitioner's defense and to convict him of some lesser offense if they felt the evidence justified it. Specifically, in addition to first-degree murder, the jury was instructed on the elements of second-degree murder with respect to both victims and on the elements of voluntary manslaughter with respect to Jose. [C.T. vol. 48 at 13177-91; R.T. vol. 307 at 52375-83.] Under California law, second-degree murder is a murder committed without deliberation or premeditation, and voluntary manslaughter is an unlawful killing committed upon a sudden quarrel or in the heat of passion. [C.T. vol. 48 at 13177-85; R.T. vol. 307 at 52375-80.] Therefore, if the jury had found the evidence supported the defense's claim that Petitioner acted out of an actual fear of immediate peril, it could have adopted (and properly so) one of these other theories of liability and found him guilty only of second-degree murder or voluntary manslaughter. That is, even in the absence of an imperfect self-defense instruction, the jurors had at their disposal, in the instructions as given, the means for considering, and giving Petitioner the benefit of, his defense that the killings resulted from his own fear of death at the hands of his parents. Nevertheless, despite being instructed on those lesser offenses, and after considering all the evidence, the jury convicted Petitioner of first-degree, premeditated murder while lying in wait and conspiracy to commit murder. Such findings clearly were inconsistent with any notion that the jury considered Petitioner's fear to be a mitigating factor. There was no error in the trial court's failure to instruct on imperfect self-defense and, thus, Petitioner's Ground Seven is appropriately denied.

1       With respect to Ground Six, there is no merit in Petitioner's contention that the trial

2   judge somehow led the defense to believe that the imperfect self-defense instruction

3   definitely would be given at the end of the trial.  It is clear from the record in this case that

4   the judge committed no error or otherwise engaged in any misconduct in his handling of the

5   imperfect self-defense issue.  The matter was discussed in pretrial proceedings in the context

6   of a hearing regarding the admissibility of defense evidence.  In that setting, the court

7   addressed the subject only as an aid for determining whether certain evidence proffered by

8   the defense would be relevant to the defense's theory of the case.  [R.T. vol. 193 at 30858-

9   59.]  The court made a tentative ruling that the evidence supported the instruction:

10              Based on the evidence presented in the first trial; and, again,

11          there is no assurance that the same evidence will be presented in

12          the retrial, but the court accepts it as an offer of proof for the

13          purpose of dealing with the issue of relevance of the expert

14          testimony, in analyzing the situation, the evidence presented in the

15          trial, the first trial, it's a very close issue on whether there was

16          substantial evidence of imminent danger.

17              My view is that, because of the closeness of the issue, the

18          fact that the prosecution analyzed it in the first trial as a situation

19          that required the instruction on imperfect self-defense, the fact that

20          such an instruction was given in the first trial, and recognizing the

21          fact that the Supreme Court has addressed the issue in *In re*

22          *Christian S.*, it is my view that because it is such a close issue, that

23          the court is inclined to analyze and rule that, for the purpose of

24          this discussion, there was substantial evidence to justify the

25          imperfect self-defense instruction to be given to the jury.

26   [R.T. vol. 193 at 30888-89.]

27       However, the court expressly qualified that ruling as being tentative: "So for this

28   analysis, the court will make that ruling, understanding full well that these matters, as we've

41

1    discussed, are made solely for the purpose of analyzing the issue of relevance of the

2    proffered evidence." [*Id.* at 30889.]  Furthermore, even before issuing its tentative ruling,

3    the court cautioned that "nothing we are discussing relates to what will happen at the end of

4    the trial by way of instructions.  It is premature at this stage to do so. . . . .This is clearly an

5    area of pretrial rulings on matters that are subject to change based upon things that actually

6    develop during the course of the trial." [*Id.* at 30878-79.]  In light of these qualifiers to the

7    court's ruling, Petitioner can have no claim that the defense was led to believe, or rely on,

8    the notion that the jury would be instructed on imperfect self-defense without fail.

9    Therefore, Ground Six also should be denied.

10

11    **F.  Ground Eight: Prosecutorial Misconduct and Trial Court Error During**

12    **Closing Arguments**

13         In his eighth ground for relief, Petitioner contends that certain statements made by the

14    prosecutor during closing arguments constituted prosecutorial misconduct.  Specifically, he

15    asserts that "[a]t trial, the prosecutor successfully moved to exclude a great deal of lay and

16    expert testimony; during his closing argument, he then skewered the defense for failing to

17    present this very testimony." [Petition at 31.]  He further argues that this misconduct was

18    exacerbated by erroneous rulings of the trial judge, based on the fact that "[t]he trial court

19    not only denied defense counsel's objections to this conduct, but denied his immediate

20    motion to reopen so he could expose the falsity of the prosecutor's argument." [*Id.*]

21    Petitioner believes that, taken together, the actions of the prosecutor and the trial judge

22    denied him his due process right to a fair trial. [Petition at 31-36; Memorandum in Support

23    of Petition at 84-93; Traverse at 39-44.]

24         The California Court of Appeal considered Petitioner's claims on appeal and rejected

25    them.  The court found that the closing arguments of the prosecutor were not improper but,

26    rather, were based on reasonable inferences drawn from the evidence and were intended to

27    respond to assertions made by defense counsel. [Motion to Dismiss, Ex. C at 141-44.]  The

28    appellate court also held that the trial court committed no error in refusing to reopen the

defense following objections to the prosecutor's statements. [*Id.* at 144.] There is no basis
in federal law for overturning that decision.

A prosecutor has a duty to refrain from using improper methods to procure a
conviction. *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991). The prosecutor's job
is not just to win, but to win fairly, staying well within the rules. *United States v. Kojayan*,
8 F.3d 1315, 1323 (9th Cir. 1993). Where a prosecutor obtains a conviction by stepping
outside those rules, the conviction is subject to challenge based on prosecutorial misconduct.
*Id.* However, to warrant habeas relief, prosecutorial misconduct must have been so
egregious as to have infected the entire trial fatally, rendering it fundamentally unfair and
denying the petitioner due process. *Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995),
*cert. denied*, 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

Under some circumstances, inappropriate comments by the prosecutor in the presence
of the jury *may* constitute prosecutorial misconduct. *Darden v. Wainwright*, 477 U.S. 168,
179-80, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). However, a prosecutor must be allowed
wide latitude in fashioning closing arguments. *United States v. McChristian*, 47 F.3d 1499,
1507 (9th Cir. 1995). Indeed, the prosecutor is entitled to strike "hard blows" and to draw
reasonable inferences based on the evidence. *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir.
1996), *cert. denied*, 522 U.S. 971, 118 S.Ct. 422, 139 L.Ed.2d 324 (1997). Furthermore, a
prosecutor is entitled to give an "invited response" to arguments made by defense counsel.
*United States v. Young*, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Thus,
where the comments in question are nothing more than a reasonable response to claims made
by the defense, a prosecutor will not be found to have engaged in reversible misconduct. *Id.*
at 12-13.

In this case, Petitioner complains about a series of comments made by the prosecutor
during closing arguments to the effect that the defense had failed to produce adequate
evidence to support its claim that Petitioner was abused by his parents. For example, during
his initial closing argument, the prosecutor pointed out that Petitioner "did not call a mental
health expert," and he asserted that "there is no evidence whatsoever that the sexual abuse

1    ever took place." [R.T. vol. 302 at 51350, 51377.]  Later, in his rebuttal argument, the

2    prosecutor again emphasized to the jury that, other than Erik's testimony, there was no real

3    evidence of physical or sexual abuse and that Petitioner failed to produce an expert witness

4    to support his defense.  [R.T. vol. 306 at 52216-19, 52287.]  At the time these statements

5    were made, defense counsel objected, asking that the statements be stricken or that a mistrial

6    be declared.  [R.T. vol. 300 at 51002-07, vol. 306 at 52216-18, 52288-93.]  In the alternative,

7    counsel asked that the evidence be reopened and that the defense be allowed to present

8    further evidence of abuse.  [R.T. vol. 300 at 51002-07.]  The trial court denied any relief.

9    [R.T. vol. 300 at 51007-12, vol. 306 at 52216-18, 52291-93.]

10        As discussed at length above, some testimony proffered by the defense to corroborate

11   the allegations of abuse, including the testimony of expert witnesses, was properly excluded

12   upon motion by the prosecution either because the testimony was cumulative to what had

13   already been presented or lacked proper foundation.  Petitioner argues, though, that since the

14   testimony was excluded pursuant to the state's own motion, the prosecutor could not, in

15   accordance with the principles of fair play, attack the defense's case based on the absence

16   of that very evidence.  However, a prosecutor may comment on the absence of evidence

17   supporting the defendant's version of events.  *United States v. Garcia-Guizar*, 160 F.3d 511,

18   521 (9th Cir. 1998).  Indeed, as long as he does not call attention to the defendant's own

19   failure to testify, a prosecutor may properly comment upon the defense's failure to present

20   witnesses in support of its position.  *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir.

21   1988).  Furthermore, a prosecutor commits no misconduct in inviting the jury to draw

22   inferences based on the admitted evidence, even where such inferences may have been

23   undermined by evidence which was ruled inadmissible by the trial court.  *Bashor v. Risley*,

24   730 F.2d 1228, 1240 (9th Cir.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77

25   (1984).

26        Here, the prosecutor did nothing other than comment on the absence of evidence

27   supporting Petitioner's version of events.  He did not, as Petitioner seems to assert,

28   personally assure the jury that no further evidence of abuse existed, nor did he imply that

Petitioner himself should have provided further evidence of abuse through his own testimony. In the context of his closing arguments, the prosecutor's statements were merely commentary on the existing state of the evidence. Specifically, the prosecutor was presenting the state's position that the evidence did not support a finding that Petitioner had been abused by his parents. This argument was a reasonable inference to invite the jury to draw and well within the bounds of professional conduct. There was no prosecutorial misconduct here, and the trial court committed no error in refusing to sustain the defense's objections to the remarks.

Moreover, there is no constitutional support for Petitioner's claim that the trial court was obligated to reopen the evidence to allow the defense an opportunity to present further evidence of abuse after the prosecutor's comments in closing argument. Petitioner seeks support in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and *Jammal v. Van de Kamp*, 926 F.2d 918 (9th Cir. 1991). [Memorandum in Support of Petition at 88, 90.] *Crane* stands for the proposition that a defendant must be given a meaningful opportunity to be heard and to present a complete defense, 476 U.S. at 690, and *Jammal* establishes that the admission of evidence violates due process only if it so fatally infected the proceedings as to render them fundamentally unfair, 926 F.2d at 919. Here, Petitioner *was* given a meaningful opportunity to be heard during a very lengthy defense presentation that included dozens of witnesses and spanned months of testimony. Furthermore, as discussed above, the evidentiary rulings at issue did not violate due process, as the testimony of the corroborating witnesses the defense sought was either cumulative or unsupported by proper foundation. *Simmons* and *Skipper* stand for the narrow proposition, inapplicable here, that a defendant in a capital case cannot be sentenced to death based on his future dangerousness unless the defense has the opportunity to present evidence on that point, including the fact that the defendant is not eligible for parole. *Simmons*, 512 U.S. at 156, 171; *Skipper*, 476 U.S. at 5 n.1. No cases cited by Petitioner stand for the proposition that a defendant has a general

constitutional right to reopen the evidence after the prosecutor's closing statements to present testimony to rebut the state's arguments, and the Court could find no such authority. Ground Eight must be rejected.

### G. Ground Nine: Gender Discrimination in Jury Selection

Finally, in Ground Nine of the Petition, Petitioner claims that the trial court allowed the prosecutor to select the jury in a discriminatory manner. Specifically, Petitioner contends that "[a]t trial, the prosecutor improperly exercised peremptory challenges on the basis of gender." [Petition at 36.] In support of this contention, Petitioner points out that the prosecution exercised 18 of its 24 peremptory challenges against women. [*Id.*] Petitioner believes that this was a pattern which evinced an intent on the part of the prosecutor to exclude women from the jury, in violation of the Equal Protection Clause. [Petition at 36-37; Memorandum in Support of Petition at 94-105.]

Petitioner's claim arises out of a series of rulings made by the trial court during jury selection. On September 21, 1995, the first eighteen prospective jurors — twelve men and six women — were selected to sit in the jury box. [R.T. vol. 211 at 34561, vol. 213 at 34881.] After extensive voir dire of those eighteen jurors, the prosecution exercised six peremptory challenges, five of them against women, identified by their juror numbers as Jurors 1527, 1524, 1236, 1317, and 1202. [R.T. vol. 213 at 34818-19, 34878-80.] Defense counsel immediately moved for a mistrial pursuant to *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890 (Cal. 1978), arguing that the prosecutor was employing his peremptory challenges in a way that was gender-biased. [R.T. vol. 213 at 34880-84.] After hearing defense counsel's argument, the trial judge found that there had been no prima facie showing of a systematic exclusion of women. [R.T. vol. 213 at 34885.] The judge held that, in light of the answers given by the jurors in question during voir dire, there was a legitimate basis for exercise of a peremptory challenge against each juror. [R.T. vol. 213 at 34884-85.] Therefore, the court denied the defense's motion for a mistrial. [R.T. vol. 213 at 34884-85.] Three more rounds of peremptories followed during which the prosecution excused six more

female jurors, identified as Jurors 1919, 1511, 1839, 1111, 1831, 1302. [R.T. vol. 213 at
34918-20, 34990-92, 35021-22, vol. 214 at 35027.]   At that point, the prosecutor had
exercised a total of fifteen challenges, eleven of them against women.  [R.T. vol. 213 at
34818-19, 34878-81, 34918-20, 34990-92, 35021-22, vol. 214 at 35027.]

The next day, before voir dire resumed, the trial judge revisited the issue sua sponte
and reiterated that there had been no showing of a prima facie case of discrimination and that
there was a legitimate basis for exercising peremptory challenges against the first five female
jurors who were excused.  [R.T. vol. 214 at 35026-27.]  The judge also found that the
subsequent challenges to female jurors were also well-supported by statements the jurors
made during voir dire. [R.T. vol. 214 at 35027-28.] Nevertheless, the judge indicated that,
for the sake of a complete record, he eventually would have the prosecutor state his reasons
for challenging all of the female jurors who were excused.  [R.T. vol. 214 at 35027.]

During the next round of peremptory challenges, the prosecution excused four more
jurors, three of them women, identified as Jurors 1220, 1207, and 1920. [R.T. vol. 214 at
35094-95.] Thus, by that time, the prosecutor had exercised a total of nineteen challenges,
fourteen against women.  The defense immediately renewed its allegation of gender bias,
aiming its objection specifically at the prosecution's excusal of Juror 1920. [R.T. vol. 214
at 35097.] Counsel argued that, given the juror's answers to questions during voir dire, the
prosecutor could have no reason to excuse her other than the fact that she was a female.
[R.T. vol. 214 at 35097.] The defense argued, again, that the prosecution had engaged in a
pattern of excluding women from the jury which gave rise to a prima facie case of gender
discrimination.  [R.T. vol. 214 at 35097-98.]  The trial court rejected defense counsel's
argument.  The court, after reviewing the juror's answers to various questions during voir
dire, and after hearing the prosecutor's reasons for excusing the juror, found that there was
a legitimate basis to exercise a peremptory challenge against Juror 1920. [R.T. vol. 214 at
35098.] The trial judge further ruled, after reviewing the entire history of the jury selection
process to that point, that there was no prima facie case of systematic exclusion. [R.T. vol.
214 at 35101-06.]

1   In the course of the next round of peremptories, the prosecutor excused two jurors, one
2   of them a woman identified as Juror 1926. [R.T. vol. 214 at 35153-54.]  At that point, the
3   prosecutor had exercised a total of twenty-one challenges, fifteen of them against women.
4   After that round of peremptories, both sides accepted the jury as constituted, and the twelve
5   juror panel, comprised of seven men and five women, was seated. [R.T. vol. 214 at 35156,
6   35227-28, vol. 215 at 35340.]

7   The trial court then began the process of selecting alternate jurors.  During the first
8   round of peremptories, the prosecution excused three jurors, all of them women, identified
9   as Jurors 1135, 1425, and 1938.  [R.T. vol. 214 at 35222-23.]  The prosecutor had thus
10  challenged a total of twenty-four potential jurors, eighteen of them women.  The defense
11  again renewed its gender-bias objection, arguing that the prosecution was excluding females
12  in disproportionate numbers. [R.T. vol. 214 at 35225-27.]  In addressing the motion, the trial
13  court first renewed its finding that there was no prima facie showing of any systematic
14  exclusion in the selection of the main, twelve-juror panel.  [R.T. vol. 214 at 35227-30.]
15  However, the court did find that, given the prosecutor's decision to strike three female
16  alternate jurors, the burden had shifted to the prosecution to explain the bases for those
17  challenges.  [R.T. vol. 214 at 35230-31.]  Upon hearing the prosecutor's justifications for
18  challenging the three jurors in question, the trial judge held that the prosecution properly had
19  excused the jurors based on answers the jurors gave during voir dire, not on the jurors'
20  gender.  [R.T. vol. 214 at 35237-38.]  Therefore, the judge once again denied the defense's
21  renewed *Wheeler* motion.  [R.T. vol. 214 at 35238.]  After another round of peremptory
22  challenges, a six-person panel of alternate jurors was seated, consisting of four men and two
23  women. [R.T. vol. 214 at 35240-41, 35284-85, vol. 215 at 35340.]

24  The following day, the prosecutor stated for the record his reasons for excluding all
25  of the female prospective jurors who were excused on peremptory challenges exercised by
26  the prosecution during the selection of the main, twelve-juror panel. [R.T. vol. 215 at 35313-
27  35.]  After listening to the prosecutor's grounds for excusing the various jurors, and after
28  hearing oral argument by defense counsel, the trial court made its final ruling on the

defense's *Wheeler* motion. The court first noted that the jury, as ultimately constituted, was reasonably well-balanced, with the main panel containing seven men and five women and the alternate panel containing four men and two women. [R.T. vol. 215 at 35340.] The court further found that the prosecutor's reasons for exercising his peremptories were well-founded, and that there were legitimate grounds for excusing each and every one of the female prospective jurors who was excluded during voir dire. [R.T. vol. 215 at 35343-44.] Accordingly, the trial judge ruled that the defense's motion for a mistrial was appropriately denied. [R.T. vol. 215 at 35344-46.]

The California Court of Appeal upheld the trial court's ruling on direct review. The appellate court found that the defense's showing of a prima facie case was insufficient. [Motion to Dismiss, Ex. C at 104-05.] The court also ruled that the answers of the various jurors during voir dire gave rise to adequate grounds for challenging the jurors, and that the prosecutor's articulated reasons for exercising his peremptories were not mere pretext for underlying discrimination. [*Id.* at 105.] Finally, the court noted that the jury, as ultimately constituted, contained five women and that the prosecution left nine of its peremptory challenges unused. [*Id.* at 106.] Based on the foregoing, the court held that the trial court properly denied the motion for mistrial. [*Id.* at 101.] That decision was not contrary to, or an unreasonable application of, clearly established federal law.

The Equal Protection Clause forbids the prosecutor in a criminal trial from challenging prospective jurors solely on account of their membership in a protected class. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Gender is a protected class and is an unconstitutional proxy for juror competence and impartiality. *J.E.B. v. Alabama*, 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Thus, principles of equal protection prohibit discrimination in jury selection on the basis of gender or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. *Id.* at 146.

Where a defendant alleges that the prosecution has exercised its peremptory challenges in violation of the Equal Protection Clause, the court must engage in a three-step analysis.

49

*Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). First, the court must determine whether the defendant has made a prima facie showing that the prosecutor used his peremptories in an unconstitutionally discriminatory manner. *Id.* If the defendant makes such a showing, the court must give the prosecutor the opportunity to come forward with a legitimate explanation for striking the jurors in question. *Id.* at 358-59. Finally, the court must decide whether the defendant has carried his ultimate burden of proving purposeful discrimination. *Id.* at 359.

Thus, the first step in this Court's analysis is to determine whether Petitioner, in the proceedings before the trial court, made a prima facie showing of intentional gender discrimination. *J.E.B.*, 511 U.S. at 144-45. In order to establish a prima facie case of discrimination, a petitioner must show that peremptory challenges were exercised against members of a constitutionally cognizable group and that this fact, along with any other relevant circumstances, gives rise to an inference that the offending party challenged the prospective jurors because they were members of that group. *United States v. De Gross*, 960 F.2d 1433, 1442 (9th Cir. 1992). That is, the petitioner must demonstrate that the overall facts and circumstances of the case raise a reasonable inference that the prosecution excluded venirepersons from the petit jury on account of their membership in a protected class. *McClain v. Prunty*, 217 F.3d 1209, 1219-20 (9th Cir. 2000). Such facts and circumstances may include a pattern of strikes against jurors from a particular group, questions and statements by the prosecutor during voir dire and in exercising his challenges, or any other factors which raise an inference of purposeful discrimination. *Batson*, 476 U.S. at 96-97.

Ordinarily, when reviewing a state trial court's fact-specific determination of whether the defendant made out a prima facie case of discrimination, a federal habeas court is obligated to give the state court's findings considerable deference, according them a presumption of correctness. *Tolbert v. Page*, 182 F.3d 677, 684-85 (9th Cir. 1999). However, the California courts frequently apply an overly stringent standard in determining whether a defendant has made a prima facie showing of discrimination, requiring the defendant to demonstrate a "strong likelihood" of bias rather than merely a reasonable

inference of bias. *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000).  In such cases, the reviewing court may not give deference to the state court's determination that the defendant failed to establish a prima facie case. *Cooperwood v. Cambra*, 245 F.3d 1042, 1046-47 (9th Cir.), *cert. denied*, 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 164 (2001).  Instead, the habeas court must evaluate de novo whether the defense demonstrated a prima facie case of discrimination. *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002).  In this case, the state courts did employ the "strong likelihood" standard in rejecting Petitioner's claim of discrimination during jury selection.  [*See* Motion to Dismiss, Ex. C at 103-05.]  Therefore, this Court must review the prima facie case of discrimination de novo.

Petitioner here has demonstrated that a large number of the prosecution's peremptory challenges were exercised against females.  Indeed, by the time of defense counsel's final *Wheeler* motion, eighteen of the twenty-four prospective jurors excused by the prosecutor were women.  [R.T. vol. 214 at 35226.]  Arguably, this constituted a pattern of strikes against female jurors.  A pattern of excluding venirepersons of a particular class at a statistically disproportionate rate provides support for an inference of discrimination. *Fernandez*, 286 F.3d at 1078.

However, there is no magic number of challenged jurors which automatically establishes a prima facie case. *United States v. Chinchilla*, 874 F.2d 695, 698 (9th Cir. 1989). Rather, the combination of circumstances taken as a whole must be considered. *Id.*  Other factors to consider include any statements made by the prosecutor, the final composition of the jury, and whether the prosecution left any of its peremptory challenges unused. *United States v. Omoruyi*, 7 F.3d 880, 881-82 (9th Cir. 1993).  In particular, the willingness of a prosecutor to accept jurors from the class in question weighs against a finding of a prima facie case. *United States v. Wills*, 88 F.3d 704, 715 (9th Cir.), *cert. denied*, 519 U.S. 1000, 117 S.Ct. 499, 136 L.Ed.2d 390 (1996); *Chinchilla*, 874 F.2d at 698 n.4.

In this case, Petitioner has not identified, and the record does not reveal, any statements or questions by the prosecutor during voir dire which would hint at some underlying resistance to the notion of having females on the jury.  In addition, there were

ultimately five women on the twelve-member jury, and there were two women among the six alternates. [R.T. vol. 215 at 35340.] Indeed, the gender breakdown of the twelve-member panel (i.e., 58% male to 42% female) exactly mirrored the distribution of men and women in the jury pool from which the jurors were selected. [R.T. vol. 215 at 35227-28.] Furthermore, the prosecution accepted this composition of the jury despite the fact that it had a number of peremptory challenges remaining at the conclusion of jury selection. Specifically, the prosecution was allotted thirty peremptories with respect to the twelve-member panel, but used only twenty-one. [R.T. vol. 167 at 27231, vol. 215 at 35313-35.] Similarly, the prosecution had twelve challenges to use during selection of the alternates, but used only four. [R.T. vol. 214 at 35158-59, vol. 215 at 35335.] Such factors are relevant in negating any "pattern" of discrimination which may be inferred from a statistical disparity in the prosecution's exercise of peremptory challenges. *Omoruyi*, 7 F.3d at 881-82. Based on all the foregoing, and after a de novo review of the record, this Court must conclude that the defense in this case did not establish a prima facie case of gender discrimination before the trial court.

In any event, even assuming that a prima facie case was established, it is clear that the defense could not have carried its ultimate burden of proving purposeful discrimination. At the second step in the discrimination analysis, the prosecution must articulate neutral explanations for the exercise of the peremptory challenges at issue. *McClain*, 217 F.3d at 1220. A "neutral" explanation means an explanation based on something other than the jurors' membership in the class in question. *Hernandez*, 500 U.S. at 360. The reason offered by the prosecutor need not rise to the level of a challenge for cause. *Id.* at 362-63. Indeed, the explanation need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, it merely must be based on a juror characteristic other than, in this case, gender. *J.E.B.*, 511 U.S. at 145. The issue is the facial validity of the prosecutor's explanations. *Hernandez*, 500 U.S. at 360. Unless a discriminatory intent is inherent in the prosecutor's explanations, the reasons offered will be deemed class-neutral. *Id.*

In this case, the prosecutor described in detail his reasons for excluding all of the
female prospective jurors who were excused on peremptory challenges.  Those reasons are
briefly summarized as follows:

- Juror No. 1527:  There were indications in this juror's profile that she was
  strongly inclined to identify with victims of child abuse.  She ran a home for
  children who had alcoholic and/or abusive parents.  [R.T. vol. 215 at 35313.]
  In fact, she discussed some of the children who had been placed with her,
  expressing a great deal of sympathy for them and frustration at not being able
  to do more to help them.  [*Id.* at 35313-14.]  She herself had been a victim of
  a sexual assault by a schoolmate when she was a child.  [*Id.* at 35314.]  She also
  indicated that she lived in fear of her own father.  [*Id.*]  She demonstrated an
  anti-prosecution bias by voicing her belief that once a prosecutor develops a
  theory he must continue to pursue it even when it is obviously wrong.  [*Id.* at
  35313.]  Finally, she indicated that she was, at one time in her life, against the
  death penalty.  [*Id.* at 35314.]

- Juror No. 1524:  This juror came from a wealthy, dysfunctional family in which
  there was physical abuse.  [*Id.* at 35316.]  She was a recovering alcoholic.  [*Id.*]
  She indicated that parents must share the blame for wrongdoing where a child
  is not raised properly, that external influences play a role in wrongdoing, and
  that sole responsibility does not lie with the wrongdoer.  [*Id.* at 35317.]  She
  was not in favor of the death penalty, except in the most extreme cases.  [*Id.*]
  She believed that life without the possibility of parole should be imposed only
  where the defendant is a threat to society.  [*Id.*]

- Juror No. 1236:  This juror had watched the first trial on television and
  indicated that she particularly remembered how the defendants cried when they
  described the abuse by their father.  [*Id.* at 35318.]  She had a degree in
  psychology and had family members who were psychologists or psychiatrists.

[*Id.*] She believed that environment controls behavior. [*Id.*] She did not believe in the death penalty when she was younger. [*Id.* at 35318-19.] Her daughter had been treated for post-traumatic stress disorder, and she had previously sat on a jury in which the defendant claimed to have suffered from post-traumatic stress disorder. [*Id.* at 35319.]

- Juror No. 1317: This juror came from a dysfunctional upbringing, which included molestation and alcoholism. [*Id.* at 35320.] She had been in a number of situations in which she was victimized, including one where she was threatened with a knife. [*Id.* at 35319.] She was once arrested for driving under the influence, and during the arrest the officers became physical with her and she suffered an injury that required stitches. [*Id.*]

- Juror No. 1202: This juror had been the victim of long-term spousal abuse in which she was physically assaulted by her husband. [*Id.* at 35320-21.] She had a background in psychiatric nursing. [*Id.* at 35320.] She was not in favor of the death penalty. [*Id.* at 35321.] The juror also gave some vague indication that she may have been charged with felony manslaughter at some point. [*Id.*] Indeed, Petitioner previously conceded during state appellate review that there were valid reasons for the prosecution to exercise a peremptory challenge against this juror. [*See* Appellant's Opening Brief at 105.]

- Juror No. 1919: This juror suffered molestation at the hands of both her step-father and her grandfather. [R.T. vol. 215 at 35322-23.] Incidents of family violence occurred in her home on a number of occasions. [*Id.* at 35323.] In addition, her best friend's husband had been accused of molesting their daughter. [*Id.*] As a result of these experiences, she had strong feelings about abuse. [*Id.*] The juror also worked in the movie industry, and the prosecutor was concerned about any such person serving on the jury because of the possibility of the individual getting involved in some sort of financial arrangement for their story. [*Id.* at 35322.]

- Juror No. 1511:  This juror grew up with parents who were very strict, raising the possibility that she would identify with the defendants.  [*Id.* at 35323-24.]  She believed that sexual abuse of children by their parents happens with some frequency.  [*Id.* at 35324.]  She indicated that the death penalty should be reserved for murderers who are likely to kill again, and she expressed her belief that the defendants in this case were not a threat to society.  [R.T. vol. 213 at 34916-17, vol. 215 at 35324-25.]

- Juror No. 1839:  This juror had a demeanor that appeared to be overly friendly toward the defense and the defendants.  [R.T. vol. 215 at 35325-26.]  She did not believe the death penalty, or even life without the possibility of parole, was appropriate punishment for anyone who could be rehabilitated and who could make a contribution to society.  [*Id.*]  Her father had been an alcoholic.  [*Id.* at 35326.]  She was seeing a psychologist due to stress.  [*Id.*]  She stated that her greatest accomplishment in life was that she was "non-judgmental."  [*Id.*]  She previously had sat on a four-month trial and expressed frustration over the length of those proceedings.  [*Id.* at 35326-27.]  She questioned how well she would be able to handle the graphic photographs which would be presented as evidence.  [*Id.* at 35327.]  She indicated that blame for misconduct should be shared with the social setting and not just placed on the wrongdoer.  [*Id.*]

- Juror No. 1111:  This juror came from a highly dysfunctional background in that there was a great deal of alcoholism and physical abuse, including molestation, in her family.  [*Id.* at 35327-28.]  She lived in fear of her father.  [*Id.* at 35327.]  She did not favor the death penalty or life without the possibility of parole as punishments.  [*Id.* at 35328.]  Petitioner previously conceded during state appellate review that there were valid reasons for the prosecution to exercise a peremptory challenge against this juror.  [*See* Appellant's Opening Brief at 109.]

// //

- Juror No. 1831: This juror indicated her belief that the defendants had suffered a lifetime of abuse at the hands of their parents. [R.T. vol. 215 at 35329.] She also expressed a strong opposition to the death penalty, indicating that it was wrong and that she would always vote against it. [*Id.*]

- Juror No. 1302: This juror's husband had suffered from alcoholism. [*Id.* at 35330.] She was relatively young, in good health, and had no children, yet she chose to not work and spent her days at home watching soap operas. [*Id.* at 35330-31.] Thus, the prosecutor was concerned that she had not demonstrated any responsibility or capacity for engaging herself in a useful endeavor. [*Id.*] She described herself as a "liberal democrat." [*Id.* at 35331.] She indicated that her most important accomplishment was having a "good heart." [*Id.*] She was very non-committal, vague, and evasive in describing her views on the death penalty. [*Id.*]

- Juror No. 1220: This juror came from a highly dysfunctional background. Her father had been abusive toward her mother, and her mother had to endure the abuse because she had no other options. [*Id.* at 35332-33.] The juror herself previously had been in an abusive marriage. [*Id.* at 35332.] Indeed, she described one incident when her ex-husband was choking her and she had to use a knife against him in self-defense. [*Id.*] She had two brothers who were cocaine addicts, and at least one of them had been charged with a drug-related crime. [*Id.* at 35333.] In addition, the juror was in the entertainment industry, working for Paramount Pictures as a paralegal and as a screenplay writer. [*Id.*] Petitioner previously conceded during state appellate review that there were valid reasons for the prosecution to exercise a peremptory challenge against this juror. [*See* Appellant's Opening Brief at 112.]

- Juror No. 1207: This juror, a seventy-year-old woman, expressed a strong and lifelong opposition to the death penalty. [R.T. vol. 215 at 35333-34.]

// //

56

- Juror No. 1920:  This juror came from a home in which her father was abusive toward her mother, and she even described a particular incident when her father broke her mother's arm. [R.T. vol. 214 at 35098, 35105, vol. 215 at 35334.] In addition, the juror apparently had made some pre-judgments about the case, indicating her belief that the defendants were abused as children, that they thought their lives were in danger, and that they had "no choice in committing the crime." [R.T. vol. 214 at 35104.]  She had been seeing a psychiatrist for depression. [R.T. vol. 214 at 35105, vol. 215 at 35334.]

- Juror No. 1926:  This juror grew up with an abusive father about whom she had very strong, negative feelings. [R.T. vol. 215 at 35335.]  He was an alcoholic and a drug abuser. [*Id.*]  The juror described one incident in particular when he became assaultive with a gun, forcing the juror to call the police. [*Id.*]

- Juror No. 1135:  This juror had a degree in psychology. [R.T. vol. 214 at 35234.]  She was a longtime homemaker with little or no work experience and, hence, had no demonstrated capacity for responsible decision-making. [*Id.* at 35234-35.]  Her husband worked in the entertainment industry. [*Id.* at 35235.]  She previously had been arrested and charged with shoplifting. [*Id.*]

- Juror No. 1425:  The prosecutor believed that this juror was dishonest in her answers during the publicity voir dire. [*Id.*]  There were indications that she had already formed the opinion that the defendants were not in their right minds at the time of the killings. [*Id.*]  The prosecutor interrogated her rather harshly during voir dire, raising the possibility that the juror would feel some resentment toward the prosecution.  [*Id.* at 35236.]  Petitioner previously conceded during state appellate review that there were valid reasons for the prosecution to exercise a peremptory challenge against this juror.  [*See* Appellant's Opening Brief at 119.]

- Juror No. 1938:  This juror indicated her belief that the blame for wrongdoing should be placed on external influences as well as on the person who committed

1    the crime. [R.T. vol. 214 at 35231.] The prosecutor felt that the juror would
2    not be able to handle the responsibility of sitting on the jury and would not be
3    able to put aside her feelings of sympathy. [*Id.* at 35232.] The juror indicated
4    that she was Catholic and that the Catholic Church was opposed to the death
5    penalty. [*Id.*] Finally, the juror had plans to begin attending college in January
6    of 1996, which would have been at a time when the trial was still ongoing. [*Id.*]

7

8        As this summary elucidates, the prosecutor in this case articulated wholly gender-
9    neutral reasons for striking all of the jurors who were excused. The grounds delineated by
10   the prosecutor were legitimate, were supported by the record, and evinced no intent to
11   exclude prospective jurors from the petit jury on account of their sex. All that was necessary
12   was for the prosecutor to offer facially valid explanations for his peremptory challenges, and
13   the prosecutor did so here.

14       At the final step of the discrimination analysis, a court must determine whether the
15   petitioner has carried his burden of proving purposeful discrimination. *McClain*, 217 F.3d
16   at 1220. The decisive question is whether the prosecutor's class-neutral explanations for his
17   peremptory challenges should be believed. *Hernandez*, 500 U.S. at 365. Thus, the trial court
18   has a duty to determine the credibility of the prosecutor's proffered explanation, and a
19   finding of discriminatory intent turns largely on the court's evaluation of that credibility.
20   *McClain*, 217 F.3d at 1220. A prosecutor's motive may be inferred from the totality of the
21   relevant facts. *Id.* Thus, for example, implausible or fantastic justifications, or justifications
22   which are objectively contrary to the facts in the record, will likely be found to be pretexts
23   for purposeful discrimination. *Id.* at 1221.

24       However, there will seldom be much evidence bearing on the veracity of the
25   prosecution's articulated explanations, and the best evidence often will be the demeanor of
26   the prosecutor himself. *Hernandez*, 500 U.S. at 365. Furthermore, evaluation of the
27   prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial
28   judge's province. *Id.* Thus, a reviewing court must give great deference to the trial judge's

findings regarding the prosecutor's credibility. *Hayes v. Woodford*, 301 F.3d 1054, 1082 (9th Cir. 2002). In fact, a federal habeas court may not overturn the finding of a trial court that the prosecutor did not use his peremptories in discriminatory manner unless there is a showing of clear error. *Id.* Moreover, it is the responsibility of the petitioner to demonstrate such error. *Id.* at 1083. The ultimate burden of persuasion regarding discriminatory motivation rests with, and never shifts from, the opponent of the peremptory challenges. *Purkett*, 514 U.S. at 768.

In this case, the prosecutor delineated specific reasons why he excused each female prospective juror who was excluded on a peremptory challenge. The reasons offered were all inherently reasonable and were closely related to issues that were to arise during the trial. For example, nine of the eighteen stricken jurors were excused because of personal experiences they had with physical and/or sexual abuse. [R.T. vol. 215 at 35313-14, 35316, 35319-23, 35327-28, 35332-35.] Allegations of physical and sexual abuse were central to Petitioner's defense, and there was a serious question whether these jurors would have been able to evaluate such allegations objectively. In addition, many of the jurors were excused because of their restrictive views about, or even outright hostility toward, the death penalty. [R.T. vol. 215 at 35314, 35317-19, 35321, 35324-26, 35328-29, 35333-34.] Given that this case was charged as capital murder, it was essential to the prosecution that it seat jurors who were open-minded about the application of the death penalty. Some of the jurors had been exposed to the first trial and already had strong opinions about such issues as whether Petitioner had in fact been abused and whether he acted in self defense. [R.T. vol. 214 at 35104, 35235, vol. 215 at 35329.] Jurors who had pre-judged the case in this way clearly were not appropriately seated on the panel in the second trial. These justifications, which arose from information gleaned during voir dire and which were supported by the record, could hardly be characterized as implausible or fantastic. Indeed, such grounds were immanently rational and give rise to a strong inference that the prosecutor was credible.

Beyond that, the trial judge made an express factual finding that the prosecutor's proffered explanations for excusing the female jurors were credible. The judge, after

1  listening to the prosecutor's recitation of the reasons why he excluded the various jurors,

2  found those reasons to be factually based and legally appropriate. [R.T. vol. 215 at 35342-

3  43.] The court noted the prosecutor's grounds were genuine reasons related to both the

4  circumstances of the case and the individual jurors, and were reasons that justified the

5  exercise of the peremptory challenges. [*Id.*] The court further found that the prosecutor's

6  explanations were sincere and not a pretext for gender discrimination. [*Id.* at 35343-46.]

7       Petitioner assails these findings by the trial judge primarily on statistical grounds,

8  arguing that the sheer proportion of peremptory challenges against women (eighteen out of

9  twenty-four) undermines the prosecutor's credibility and exposes his gender-neutral

10  explanations as mere pretext. [Petition at 36-37; Memorandum in Support of Petition at 94-

11  105.] Disparate impact should be given consideration in determining whether the prosecutor

12  acted with discriminatory intent. *Hernandez*, 500 U.S. at 362. However, disparate impact

13  is not the conclusive factor. *Id.* State action of any kind will not be held unconstitutional

14  solely because it results in disproportionate impact. *Id.* at 359-60. Proof of discriminatory

15  intent or purpose is required to show a violation of the Equal Protection Clause. *Id.* at 360.

16  Furthermore, "discriminatory purpose" implies more than intent as volition or intent as

17  awareness of consequences. *Id.* It implies that the decisionmaker selected a particular

18  course of action because of, not merely in spite of, its adverse effect upon an identifiable

19  group. *Id.* Thus, equal protection analysis turns on the intended consequences of a

20  government classification. *Id.* at 362. Unless the government actor adopted a criterion with

21  the intent of causing the impact asserted, that impact itself does not violate the principle of

22  class neutrality. *Id.*

23       In this case, Petitioner has not identified anything other than disparate impact on

24  female jurors to support his claim that the prosecution exercised its peremptory challenges

25  with discriminatory intent. Moreover, the balance of evidence in the record strongly

26  supports a finding that the prosecution did not harbor illegitimate motives. The prosecutor

27  articulated valid and persuasive reasons for excluding all of the prospective female jurors

28  who were excused. The trial judge, who observed the prosecutor's demeanor, found him to

1  be credible and ruled that his gender-neutral explanations were genuine.  That finding is

2  entitled to great deference and may be overturned only upon a showing of clear error.

3  Petitioner has demonstrated no such error here.  Where there is nothing in the record to cast

4  substantial doubt on the trial court's finding that the defense failed to show purposeful

5  discrimination by the state, the constitutional claim must fail.  *United States v. Steele*, 298

6  F.3d 906, 914 (9th Cir.), *cert. denied*, 123 S.Ct. 710 (2002).

7      The prohibition against striking potential jurors solely on the basis of their sex does

8  not imply the elimination of all peremptory challenges, nor does it conflict with the state's

9  legitimate interest in using such challenges in an effort to secure a fair and impartial jury.

10  *J.E.B.*, 511 U.S. at 143.  A prosecutor still may remove jurors who he feels are less

11  acceptable than others on the panel as long as he does not rely on unlawful grounds, such as

12  gender, in making this determination.  *Id.*  Here, it is clear from the record that the prosecutor

13  did nothing more than exercise peremptory challenges against individuals who, based on

14  their profiles and the answers they gave during voir dire, likely would not have been fair and

15  impartial jurors.  Petitioner simply has not made the case that the gender of the prospective

16  jurors played any part in the prosecutor's decisionmaking.  As such, Petitioner's Ground

17  Nine for relief must be denied.

18

19                      **III.  RECOMMENDATION**

20      In accordance with the foregoing, IT IS RECOMMENDED that the Court issue an

21  order: (1) approving and adopting this Report and Recommendation; and (2) directing that

22  judgment be entered dismissing this action with prejudice.

23

24

25

26  Dated:  _March   3_   , 2003        _____

27                          ARTHUR NAKAZATO
                        UNITED STATES MAGISTRATE JUDGE

28